UNITED STATES DISTRICT COURT DISTRICT OF MASSACHUSETTS
--------------------------------------------------------------------x

Michel DeGraff,

                         Plaintiff,

                                                No:

    -against-

Massachusetts Institute of Technology,
Tim Walberg in his official capacity as
the Chairman of the House Committee
on Education & Workforce, and
the House Committee on Education
& Workforce,

                         Defendants.
--------------------------------------------------------------------x

## COMPLAINT FOR DECLARATORY, INJUNCTIVE AND MONETARY RELIEF

       Plaintiff Michel DeGraff, by and through his undersigned counsel Jonathan Wallace and Jolie Parisi, for his Complaint against Defendants Massachusetts Institute of Technology (MIT), Tim Walberg and the House Committee on Education & Workforce ("the Committee"), alleges as follows:

## INTRODUCTION

1. On March 17, 2026, the House Committee on Education & Workforce (the "Committee") issued a Majority Staff Report titled *How Campuses Became Hotbeds: The Rise of Radical Antisemitism on College Campuses* ("the March 17, 2026, Report"). The March 17, 2026, Report repeatedly names Plaintiff, republishes disputed allegations from *Sussman v. MIT* 1:25-cv-11826, (D. Mass. 2025) as if they were established "facts," and escalates the Committee's ongoing pressure campaign to induce MIT and other universities to adopt and enforce the constitutionally flawed International Holocaust Remembrance Alliance

("IHRA") definition of "antisemitism" [1] as a *de facto* speech code—thereby suppressing protected speech critical of Israel and supportive of Palestinian rights.

2. The March 17, 2026, Report's treatment of Plaintiff as guilty until proven innocent— without any neutral investigation and while ignoring controlling legal rulings— exemplifies the prospective harm this action seeks to prevent. In *Sussman v. MIT*, Judge Richard G. Stearns of the United States District Court for the District of Massachusetts rejected the conflation of anti-Zionism with antisemitism, holding that "anti-Israel sentiment is not, without more, antisemitic messaging." Yet the Committee now amplifies the lawsuit's already discredited allegations, treating them as if they were adjudicated truth, and using them to justify continuing demands for sweeping categories of MIT records that can identify, isolate and endanger disfavored speakers. Absent prospective injunctive relief, the Committee's libelous statements will be entered into the record as facts, doing irreparable reputational and psychological harm, and chilling free speech. Further, the Committee's campaign appears to be ongoing and likely to amplify an already damaging series of misrepresentations.

3. On information and belief, the Committee, on the heels of the March 17, 2026, Report, has sent a third letter to MIT asking for production of documents about Plaintiff, threatening to escalate with subpoenas if MIT does not oblige.

4. The harmful intent of the Committee's campaign and the true nature of its investigation of "antisemitism"—*a political vendetta with no legislative purpose whatsoever*—are also confirmed by Chairman Tim Walberg's own extra-legislative publications. On

---

[1]There are a number of pending lawsuits which will result in rulings on the unconstitutionality of IHRA. A District Court in Texas, in granting a preliminary injunction to Students for Justice in Palestine, held that Texas' adoption of the IHRA standards "arguably proscribed" Plaintiffs' First Amendment-protected criticism of Israel, *Students for Just. in Palestine v. Abbott,* 756 F. Supp. 3d 410, 421 (W.D. Tex. 2024).

March 19, 2026—two days after the issuance of the March 17, 2026, Report—Chairman Walberg published an opinion essay in the *Daily Wire* identifying MIT and Plaintiff by name and repeating the Committee's narrative that "radical faculty" are "fanning the flames" and driving a "rise in antisemitism"—even claiming that Plaintiff's teaching at MIT in Massachusetts has contributed to a "chaos [that] leads to violence," including a terrorist attack with explosives against a synagogue in Michigan.[2] Even an elementary detail such as Plaintiff's professional status at MIT is inaccurately described in the article's subtitle: "At MIT, former [sic] linguistics professor Michel DeGraff accused a student of having a Zionist 'mind infection'." The Chairman of this Committee on "Education" and Workforce didn't seem to bother to fact-check his "findings"—he could have, for example, checked the MIT Linguistics website.[3] If he did, he might have noticed that Plaintiff is currently teaching two *linguistics* courses at MIT. Indeed, Plaintiff is still a *linguistics* professor even with his new title as a School of Humanities, Arts and Social Sciences "faculty at large" no longer affiliated with MIT Linguistics. In spite of such a basic factual inaccuracy, Chairman Walberg asserted that his Committee has "released a report" whose "findings are clear."

5. Another such "finding" in Chairman Walberg's opinion essay directly targeting Plaintiff is the purported evidence of "antisemitism" in the allegation that Plaintiff "accused a student of having a Zionist 'mind infection'." Chairman Walberg's equating Zionism (a *political* ideology) and Judaism (a *religious* faith) is another distortion—an inaccuracy that's both historical and factual. Yes, many Jews are pro-Israel, but so are many *non*-Jews. Besides, many Jews are *anti*-Zionist while the majority of Zionists are *Christian*, not Jewish,

---

[2] https://www.dailywire.com/news/the-profs-arent-alright-how-radical-faculty-fuel-the-rise-of-campus-antisemitism
[3] https://web.archive.org/web/20260324230558/https://linguistics.mit.edu/courses/

including influential members of the current administration such as Mike Huckabee and Pete Hegseth.[4] Moreover, core tenets of certain brands of extremist Christian Nationalists' Zionism are fundamentally *antisemitic*: the U.S. is an exclusively "*Christian* nation"; U.S. military operations are "part of a broader war to defend *Christian* Nations"; and the end-times showcase the salvation of all *Christians* and the extermination of all *non*-Christians, *including the Jews*, at the time of the "Rapture" once all Jews are gathered in the biblical "Land of Israel" (emphases added).[5] In this context, "Christian" identity is treated as a marker of legitimacy ("We are part of one civilization—Western civilization… forged by centuries of shared history, Christian faith, culture, heritage, language, ancestry…" dixit Marco Rubio[6]) while dissenting viewpoints—particularly on Israel/Palestine—are cast as civilizational threats rather than protected political speech. Again, facts don't seem to matter. Contrary to rulings in federal courts such as *Stand with Us v. MIT*[7] and Sussman v. MIT,[8] Walberg considers as "antisemitism" scholarly critiques of Zionism. He—like the Committee and like the Plaintiffs in *Sussman v. MIT*—misrepresents as "antisemitic" the phrase "mind infection" even though Plaintiff cited this phrase from the work of Israeli Jewish Professor Nurit Peled-Elhanan, formerly at Hebrew University and a 2001 Winner

---

[4] https://www.nytimes.com/2026/02/22/world/middleeast/huckabee-israel-tucker-carlson.html?unlocked_article_code=1.V1A.yVXY.HaxXbYdGP1c0; https://www.nytimes.com/2026/03/20/us/politics/hegseth-christianity-military.html

[5] https://thetech.com/2025/05/15/call-for-courage-degraff; https://www.tandfonline.com/doi/full/10.1080/03626784.2025.2607673; https://www.tandfonline.com/doi/full/10.1080/04353684.2021.1891557; https://apnews.com/article/pete-hegseth-pentagon-christian-nationalism-iran-war-f246bca60f2927336b5d06b2c9daee80; https://www.militaryreligiousfreedom.org/2026/03/mrff-inundated-with-complaints-of-gleeful-commanders-telling-troops-iran-war-is-part-of-gods-divine-plan-to-usher-in-the-return-of-jesus-christ/; https://www.theguardian.com/us-news/2026/mar/08/pete-hegseth-pentagon-trump-iran;

[6] https://www.state.gov/releases/office-of-the-spokesperson/2026/02/secretary-of-state-marco-rubio-at-the-munich-security-conference

[7] https://www.juancole.com/2025/10/227621.html

[8] https://www.counterpunch.org/2026/02/17/what-a-federal-court-taught-us-and-what-universities-must-learn-about-anti-zionism-vs-antisemitism/

of the European Parliament's Sakharov Prize for Freedom of Thought.[9] Prof. Peled-Elhanan introduced the phrase "mind infection" in her analyses of anti-Palestinian and antisemitic narratives in Israeli textbooks. But, here too, facts don't matter. Chairman Walberg omits the fact that the phrase comes from published scholarship by an Israeli Jewish scholar. Instead, he presents it as evidence of Plaintiff's personal animus against Jews as Jews—yet another example of converting protected academic discourse into "antisemitism."[10]

6.  Neither does Chairman Walberg note that it's the Zionist student whom he presents as a victim, Will Sussman, who, in November 2024, led a social-media mob against Plaintiff. That mob created a thread, starting with Sussman's initial post, that eventually contained such virulent insults and threats that Cambridge Police had to provide extra protection to Plaintiff and his family.[11] Plaintiff is still receiving insults and threats in his email inbox which he shares with MIT Police.

7.  Not only facts are disregarded, but the law itself seems to not matter, in Chairman Walberg's essay. He takes the pro-Palestine slogan "From the river to the sea" as an expression of antisemitism. He thus ignores the fact that, in *Stand With Us v. MIT* (Oct. 21, 2025), the United States Court of Appeals for the First Circuit, in Boston, ruled that this slogan, on a par with "Globalize the Intifada," is political speech that is *not* inherently unlawful and that, unless uttered in a context of real harassment, is duly

---

[9] https://www.europarl.europa.eu/sakharovprize/en/nurit-peled-elhanan-2001-israel/products-details/20200331CAN54184

[10] https://link.springer.com/chapter/10.1057/9780230611702_21; https://www.degruyterbrill.com/document/doi/10.12987/9780300183337-007/html; https://www.palestine-studies.org/en/node/163293; https://mitpressbookstore.mit.edu/book/9781957792064; https://cice.hiroshima-u.ac.jp/wp-content/uploads/2014/03/14-2-8.pdf

[11] https://www.middleeasteye.net/big-story/teach-linguistics-mit-zionist-lawsuit-shows-language-silence-israel-critics; https://mondoweiss.net/2025/04/i-faced-censorship-and-attacks-at-mit-for-trying-to-teach-about-palestine-this-reflects-the-rising-fascism-in-higher-education/

protected by the free-speech rights provided by the First Amendment to the U.S. Constitution.[12]

8. Chairman Walberg's public attacks against Plaintiff thus underscore that the campaign is ongoing, political and aimed at chilling and punishing disfavored viewpoints—making prospective injunctive relief necessary.

9. Any suggestion that the risk is "past" or speculative should be rejected. Defendants bear a heavy burden to show that challenged conduct cannot "reasonably be expected to recur." *Khalil v. Trustees of Columbia Univ. in the City of NY, 20*26 U.S. Dist LEXIS 58267, at *28 (S.D.N.Y. Mar. 19, 2026, No. 25-cv-2079 (AS)) (citing *FBI v. Fikre*). The Committee has not withdrawn its demands, has escalated from letters to published reports, and has shown continuing intent to pursue further oversight. MIT's documented cooperation confirms that future productions remain a substantial and ongoing risk absent an injunction.

10. Even if MIT attempts to "de-identify" records, de-identification does not eliminate the real-world risk of identification. Courts have recognized that records can be "de-identified" yet "not anonymized in the relevant sense," because it may be "feasible to uncover [individuals'] identities given the unredacted contextual information." *Khalil v. Trustees of Columbia Univ. in the City of NY, 20*26 U.S. Dist LEXIS 58267, at *27 (S.D.N.Y. Mar. 19, 2026, No. 25-cv-2079 (AS)). Here, the Committee's demonstrated practice of repackaging allegations as "findings," combined with contextual details about events, dates, roles, and affiliations, makes re-identification and doxing-style retaliation foreseeable absent injunctive relief. Meanwhile Plaintiff keeps receiving insults and threats

---

[12] https://www.theguardian.com/us-news/2026/mar/19/pro-palestinian-speech-antisemitism-lawsuits; https://www.courthousenews.com/wp-content/uploads/2025/10/first-circuit-mit-gaza-protest-dismissal.pdf

in his email inbox, related to accusations that, like in the Committee's reports and letters, conflates Plaintiff's critiques of Zionism and his opposition to genocide with "antisemitism."

11. The March 17, 2026, Report frames the Committee's campaign as enforcement of an expansive definition of "antisemitism," including pressure on universities to adopt the IHRA definition and to punish protected anti-Zionist and pro-Palestinian expression. The Committee invokes federal anti-discrimination law as rhetorical cover while engaging in viewpoint-discriminatory "jawboning" designed to coerce universities into censorship and retaliation without subpoenas, adjudication or due process.

12. Plaintiff seeks injunctive relief to stop this ongoing campaign before it causes further irreparable harm. Official congressional publications that repeatedly name Plaintiff and tendentiously label him as a specific and egregious example of "antisemite," and that demand broad categories of records that can identify him and his associations, predictably chill protected speech and invite doxing and retaliation. Money damages alone cannot remedy the continuing chill on speech, the stress that is caused by repeated accusations of "antisemitism" and the ongoing risk of future targeting.

13. This action seeks to halt a "New McCarthyism" advanced by the Committee which, under the guise of investigating antisemitism, is pressuring MIT to suppress speech critical of Israel and supportive of Palestinian rights.[13]

---

[13] This is the fifth federal action against a university regarding compliance with a letter from the Committee; *Fakhreddine v. U Penn* 2:24-cv-01034 (EDPA), *Khalil v. Columbia*, 1:25-cv-02079 (S.D.N.Y.), *Bedi v. Committee* 1:25-cv-03837 (ND Il.) and *Gardinier v. Sarah Lawrence College* 7:25-cv-06442 (S.D.N.Y. 2025). All actions but Fakhreddine also name the Committee as a defendant.

14. In this new McCarthyism, vague and usually false accusations of "antisemitism" have been substituted for the old House Unamerican Activities Committee's ("HUAC") focus on purported "Communism."

15. Through two letters to MIT President Sally Kornbluth, the Committee has demanded production of confidential documents pertaining to MIT students, faculty and staff whom the Committee accuses of antisemitism. In those letters, the Committee adopts a broad, facially unconstitutional definition of "antisemitism" and demands sweeping categories of documents and communications "referring or relating to" Israel, Palestine, Zionism, Judaism, and "antisemitism"—categories that can readily be used to identify and single out particular speakers and associations for stigma, harassment, and professional retaliation. The Committee's definition of "antisemitism" includes almost all criticism of the Israeli nation-state, opposition to the political ideology of Zionism, and any expressed support for the Palestinian people. *See* Letter from the Committee to MIT, note 11 (December 11, 2025).[14] The Committee's definition of "antisemitism" is at odds with determinations by several federal courts—including one in this district—holding that "anti-Israel sentiment is not, without more, antisemitic messaging." *See* Order Granting Motion to Dismiss, *Sussman v. MIT* 1:25-cv-11826, Docket #75 (D. Mass. Jan. 5, 2026); *accord StandWithUs Ctr. for Legal Just. v. Massachusetts Inst. of Tech*., 2025 U.S. App. LEXIS 27390, at \*18 (1st Cir Oct. 21, 2025, No. 24-1800); *Landau v. Corp. of Haverford Coll*., No. 24-2044, 2025 U.S. Dist. LEXIS 1402, at \*4-5 (E.D. Pa. Jan. 6, 2025); *Canel v. Art Inst. of Chicago*, 2025 U.S. Dist LEXIS 30309, at \*24-25 (ND. Ill. Feb. 20, 2025, No. 23 CV 17064); *Gerwaski v. Nevada ex rel. Bd. of Regents of the NV Sys. of Higher*

---

[14] https://edworkforce.house.gov/uploadedfiles/mit_letter_12.11.25.pdf

*Educ.*, 2025 U.S. Dist LEXIS 84645, at \*21-22 (D. Nev. May 5, 2025, No. 2:24-cv-00985-APG-MDC); *Newman v. Point Park Univ.*, No. 2:20-cv-00204, 2022 U.S. Dist. LEXIS 60722, at \*78-79 (W.D. Pa. Mar. 31, 2022).

16. The Committee's investigation serves no valid legislative purpose. Rather than target actual antisemitism, the Committee seeks to malign and punish individuals with whom it disagrees. Notably, "there is no congressional power to expose for the sake of exposure." *Watkins v. United States*, 354 U.S. 178, 200 (1957). Accordingly, this Court has subject matter jurisdiction to consider and enjoin the Committee's actions. *See id.* at 198 ("[S]uch an investigation into individual affairs is invalid if unrelated to any legislative purpose").

17. The Committee has conducted no neutral, fair, or careful investigation. Instead, in its first contacts with universities—including MIT—the Committee relies on hearsay, adversarial sources, and politically motivated accusations to accuse the university of fostering an antisemitic environment. The Committee apparently gleans such hearsay and accusations from doxing sites, and from individuals and organizations that seek to suppress pro-Palestine expression and any indication of so-called "wokeness" on campuses.[15]

18. MIT has participated in this new McCarthyism, breaching its contractual promises to its students, faculty and staff, regarding the preservation of free speech, academic freedom, and privacy. These promises appear in several communications from MIT, including MIT's Policies and Procedures,[16] MIT's Rules and Regulations of the Faculty,[17] MIT's

---

[15] For example, in its December 11, 2025, letter the Committee cites as "facts" allegations in the *Sussman v. MIT* lawsuit that are demonstrably false, as documented in this recent article by Plaintiff: https://www.middleeasteye.net/big-story/teach-linguistics-mit-zionist-lawsuit-shows-language-silence-israel-critics
[16] https://policies.mit.edu/policies-procedures
[17] https://facultygovernance.mit.edu/

Statement on Freedom of Expression and Academic Freedom,[18] MIT's Mind and Hand Book,[19] and also its implied obligation of good faith and fair dealing. MIT's Mind and Hand Book states:

> "…in an academic community, the free and open exchange of ideas and viewpoints reflected in the concept of academic freedom may sometimes prove disturbing or offensive to some. The examination and challenging of assumptions, beliefs or opinions is, however, intrinsic to the rigorous education that MIT strives to provide. MIT policies are not intended to compromise the Institute's traditional commitment to academic freedom or to education that encourages students to challenge their own views of themselves and the world."

19. MIT has not upheld its promises and obligations regarding free speech, academic freedom and privacy when it comes to criticism of the state of Israel and advocacy opposing the Israeli genocide in Palestine.

20. MIT has failed to provide an education free from discrimination or harassment based on students' racial identities, national origin and/or their association with and advocacy for Palestinians students and co-workers. The U.N. Special Rapporteurs on the Right to Education recognized the discriminatory hostile climate at MIT in a letter to MIT President Sally Kornbluth.[20] The U.N. Rapporteurs expressed their concerns about serious allegations of human rights violations on campus, primarily concerning the suppression of pro-Palestinian expression since October 2023. The concerns center on reported instances of excessive disciplinary measures, arrests, use of force, and the disproportionate targeting

---

[18] https://facultygovernance.mit.edu/sites/default/files/reports/20221221_MIT_Statement_on_Freedom_of_Expression_and_Academic_Freedom.pdf
[19] https://handbook.mit.edu/
[20] https://spcommreports.ohchr.org/TMResultsBase/DownLoadPublicCommunicationFile?gId=29849

of students of color, which the experts believe may violate rights including freedom of expression, assembly, association and education.

21. MIT's hostile climate has resulted in unlawful retaliation against Plaintiff, the sole Black faculty member at MIT Linguistics, for advocating for Palestinian, Arab and Muslim co-workers and students. MIT has retaliated against Plaintiff for his pro-Palestine and anti-genocide advocacy, and for his proposal to teach an elective "Special Topics" seminar at MIT Linguistics about "Language and linguistics for decolonization and liberation in Haiti, Palestine and Israel" ("Special Topics linguistics seminar").

22. MIT rejected Plaintiff's proposed Special Topics linguistics seminar in Plaintiff's decades-long area of expertise[21] based on the false pretext that he "lack[s] expertise," and on "questions of fit, given the linguistics curriculum." Yet one core purpose of education at MIT (be it through "Special Topics," "Advanced Seminars" or otherwise) is to *create expertise and advance knowledge* in new areas—as highlighted in the very first sentence of MIT's mission statement.[22] Plaintiff's and other faculty members' Special Topics seminars and other courses have, indeed, explored new areas outside their previous fields of expertise. In MIT's flagship *Undergraduate Research Opportunity Program* (UROP), students are encouraged to *propose and pursue their own research ideas as early as their very first semester of freshman year*.[23] MIT Linguistics nevertheless constrained Plaintiff to address language and power in his native Haiti only[24] while imposing no comparable restrictions on non-Black faculty or even *non*-faculty affiliates in the same department.[25] It

---

[21] https://archive.is/YXzoc; https://archive.is/07GD8; https://archive.is/6MWzD; http://mit.edu/degraff
[22] https://www.mit.edu/about/mission-statement/
[23] https://urop.mit.edu/
[24] https://mondoweiss.net/2025/04/i-faced-censorship-and-attacks-at-mit-for-trying-to-teach-about-palestine-this-reflects-the-rising-fascism-in-higher-education/
[25] https://news.mit.edu/2022/michel-degraff-linguistics-society-america-fellow-1013

is racist to assume that a full professor of linguistics, already granted "the highest honor in the field of linguistics"[26] for his research on language and power, can, overnight, only advance knowledge on topics that pertain exclusively to his native country while his non-Black colleagues routinely explore fields of linguistic inquiry outside their native countries and outside their respective previous areas of expertise. This selective treatment supports the inference that MIT's true motive was to suppress Plaintiff's teaching on Palestine and Israel. The specific dates and steps in this course-rejection process—and the related retaliatory consequences—are set out in the "Specific Breaches" section below.

23. MIT has punished Plaintiff for his protests against discrimination, and diminished his salary and professional role as Professor of Linguistics and an expert in the field of language and power. MIT has even denied him a pay raise for reasons including the fact that he did not teach his regular course load in 2024–2025—a consequence of his course proposal having been rejected by MIT Linguistics.

24. These pervasive and severe patterns of suppression and retaliation have exposed Plaintiff to ongoing harm. This pattern of harm includes ongoing restrictions on Plaintiff's teaching, the withholding of his pay raise in 2024–2025, and no pay raise at all in 2025–2026. In November 2024, he was removed from his department of 28 years—a punitive removal that has damaged his professional reputation and deprived him of his intellectual lifeline and professional opportunities.

25. In May 2025, Plaintiff DeGraff filed a complaint with the Massachusetts Commission Against Discrimination (MCAD).

## PARTIES

---

[26] https://news.mit.edu/2022/michel-degraff-linguistics-society-america-fellow-1013

26. **Plaintiff MICHEL DEGRAFF** is a tenured Professor of Linguistics at MIT. He has been directly implicated in the Committee's focus, as the December 11, 2025, letter specifically references a lawsuit naming him: *William Sussman, Lior Alon, John Doe and The Louis D. Brandeis Center Coalition to Combat Anti-Semitism v. Massachusetts Institute of Technology and Michel DeGraff*. The complaints against DeGraff in the *Sussman v. MIT* lawsuit have been dismissed by a court order on January 5, 2026, where District Judge Richard G. Stearns, in granting DeGraff's motions to dismiss, explicitly found that "anti-Israel sentiment is not, without more, antisemitic messaging."

27. **Defendant MASSACHUSETTS INSTITUTE OF TECHNOLOGY (MIT)** is a private educational institution located in Cambridge, Massachusetts, and a recipient of federal funding.

28. Defendant **TIM WALBERG** is Chairman of the House Committee on Education & Workforce and is sued in his official capacity.

29. Defendant **THE HOUSE COMMITTEE ON EDUCATION & WORKFORCE (THE COMMITTEE)** is a committee of the U.S. House of Representatives.

## JURISDICTION AND VENUE

30. This Court has jurisdiction over the federal claim pursuant to 28 U.S.C. §1331.

31. This Court has jurisdiction over the state law claims under 28 U.S.C. §1367.

32. Venue is proper in the District of Massachusetts where MIT is located, as a substantial part of the events giving rise to the claims occurred within this district.

## FACTS

*The Committee's March 17, 2026 Majority Staff Report Escalates Its Campaign Against Plaintiff and MIT*

33. On March 17, 2026, the Committee issued a Majority Staff Report titled *How Campuses Became Hotbeds: The Rise of Radical Antisemitism on College Campuses* (the "March 17, 2026, Report"). The March 17, 2026, Report repeatedly names Plaintiff and presents disputed allegations about him as if they were established facts, despite the absence of any neutral adjudication. It does so through an MIT "case study" that asserts: "MIT linguistics professor Michel DeGraff has made claims online and in the classroom of a 'Zionist mind infection.'" (p. 17). The Report then asserts, again as fact, that Plaintiff "targeted and harassed a Jewish student repeatedly" (p. 17). This is not neutral oversight; it is official republication of inflammatory and defamatory accusations, calculated to chill speech and to pressure MIT to suppress disfavored viewpoints. [27]

34. The March 17, 2026, Report confirms that the Committee's operative benchmark is the IHRA definition and related "standards," and it uses that benchmark to treat protected political speech as "antisemitism." The Report describes IHRA as "the leading internationally accepted definition of antisemitism" and states that it "captures" common campus manifestations, including "claiming Israel is a 'racist endeavor' or comparing Israelis to Nazis." (p. 8). The Committee's drive to impose IHRA thus demands viewpoint discrimination by design—punishing speech about Israel that would be protected if directed at any other state.[28]

35. Consistent with that project, the March 17, 2026, Report attacks alternatives to IHRA, including the Jerusalem Declaration on Antisemitism ("JDA"), precisely because the JDA

---

[27] https://www.middleeasteye.net/big-story/teach-linguistics-mit-zionist-lawsuit-shows-language-silence-israel-critics; https://www.counterpunch.org/2026/02/17/what-a-federal-court-taught-us-and-what-universities-must-learn-about-anti-zionism-vs-antisemitism/

[28] As mentioned above, there are a number of pending lawsuits which will result in rulings on the unconstitutionality of IHRA. A District Court in Texas, in granting a preliminary injunction to Students for Justice in Palestine, held that Texas' adoption of the IHRA standards "arguably proscribed" Plaintiffs' First Amendment-protected criticism of Israel, *Students for Just. in Palestine v. Abbott,* 756 F. Supp. 3d 410, 421 (W.D. Tex. 2024).

refuses to treat protected political advocacy as antisemitism *per se*. The March 17, 2026, Report notes that the JDA "was created in response to the IHRA definition" and complains that it describes Boycott, Divestment, Sanctions (BDS) efforts as "not, in and of themselves, antisemitic." (p. 8). The Committee's hostility to the JDA underscores that the Committee's purpose is not neutral enforcement of anti-discrimination norms, but the imposition of one contested ideological definition of "antisemitism" (that is, pro-Israel orthodoxy) as a condition of academic life.

36. The March 17, 2026, Report also targets protected campus advocacy at MIT. It asserts that "At MIT, the graduate student union adopted a resolution… calling on the Institute to 'cut[] all research and financial ties with the Israeli military'…" (p. 26). That is classic First Amendment speech and association on a matter of public concern. The Report nevertheless portrays such advocacy as suspect, signaling that the Committee's "antisemitism" campaign is being deployed to delegitimize and deter constitutionally protected pro-Palestinian expression at MIT.

37. The March 17, 2026, Report also attacks MIT faculty—chief among them Plaintiff—as "antisemitic," using Plaintiff's protected speech as its "example." Even when the Report quotes MIT's own internal findings that cut against the Committee's defamatory narrative, it still republishes the accusations as proof of guilt. For instance, it quotes MIT's Discrimination and Harassment Response Office as concluding there was not a "sufficient basis to conclude" that Plaintiff's decision to use certain exchanges as a case study "was based on [a student's] Jewish identity" (p. 18). The Report further quotes MIT's finding that Plaintiff's "mind infection" phrase "relates to his views of the Israeli government" (p. 18). Yet the Report still deploys these contested matters to smear Plaintiff as an

antisemite—despite the dismissal of the federal claims against Plaintiff in *Sussman v. MIT* and Judge Richard G. Stearns's statement that "anti-Israel sentiment is not, without more, antisemitic messaging", *Sussman v. MIT* 1:25-cv-11826 Docket #75 (D. Mass. Jan. 5, 2026). As already mentioned, the phrase "mind infection" originates, not with Plaintiff, but from the meticulous research by Israeli Jewish Professor Nurit Peled-Elhanan on the racist narratives in Israeli textbooks that discriminate against both Palestinians and certain groups of Jews (among Eastern European, Mizrahi and Ethiopian Jews).[29]

38. The March 17, 2026, Report thus makes explicit what the Committee's prior letters already signaled: the Committee's impermissible goal is to punish and deter First Amendment-protected pro-Palestinian and anti-Zionist expression at MIT by treating accusations as "facts," amplifying those accusations through official congressional publications, and coercing MIT to adopt and enforce IHRA-based censorship. Put differently, the Committee is attempting to convert a contested ideological definition into a *de facto* federal speech code—enforced through intimidation rather than law.

39. These developments sharpen—rather than moot—the need for prospective injunctive relief. The Committee's March 17, 2026, Report confirms that the investigation is ongoing and that further public accusations and further demands on MIT are reasonably likely. Indeed, the Committee has moved from letters to an official Report that repeatedly names Plaintiff and republishes accusations as "findings," increasing the foreseeable risk of harassment, doxing, professional retaliation, and chilled speech. The March 17, 2026, Report's MIT "case study" demonstrates the Committee's willingness to treat disputed

---

[29] https://link.springer.com/chapter/10.1057/9780230611702_21; https://www.degruyterbrill.com/document/doi/10.12987/9780300183337-007/html; https://www.palestine-studies.org/en/node/163293; https://mitpressbookstore.mit.edu/book/9781957792064; https://cice.hiroshima-u.ac.jp/wp-content/uploads/2014/03/14-2-8.pdf

allegations as settled truth (p. 17) while the Committee simultaneously demands sweeping categories of MIT records "referring or relating to" "Israel," "Palestine," "Zionism," and "antisemitism"—categories that, given Plaintiff's public profile and the specificity of the Committee's focus, can readily be used to identify, isolate and endanger disfavored speakers. Absent an injunction, the Committee's escalating campaign is reasonably likely to continue, and Plaintiff will continue to suffer irreparable harm from this state-backed pressure to punish protected speech going forward.

40. The Committee's published appendices to the March 17, 2026, Report further demonstrate that the Committee's campaign is operational and document-driven: the Committee obtains confidential internal documents from universities—including emails, training and meeting materials, and course-related documents—often accompanied by confidentiality designations and heavy redactions implicating privacy regimes such as FERPA. The appendices corroborate Plaintiff's reasonable fear that MIT will be pressured to produce similarly identifying materials about Plaintiff, his scholarship, his communications and his associations, and that such materials can be repurposed for stigma, doxing-style retaliation and future coercion. This pattern confirms that the Committee's threats of continued 'oversight' operate in practice through document demands and public repackaging— making the risk of future production concrete, not speculative.

***The Real Target of the Committee's IHRA-Based Framework for Defining and Combating "Antisemitism" is First Amendment-Protected Speech Criticizing Israel or Advocating for Justice in Palestine***

41. As the March 17, 2026, Report and its published appendices demonstrate, prospective relief is necessary: this report, like Walberg's essay in *the Daily Wire,* transforms disputed

allegations into official "findings," and it signals that the Committee will keep demanding broad categories of records that can identify and expose disfavored speakers. The Committee's campaign has proceeded through two letters to MIT President Sally Kornbluth, each demanding confidential documents about MIT students, faculty, and staff, whom the Committee accuses of antisemitism using its IHRA-based definition that conflates anti-Zionism with antisemitism.

42. The first letter, dated March 8, 2024 ("the first letter"), demands a wide range of documents and communications dating back to January 1, 2021, including reports of antisemitic and anti-Israel incidents, disciplinary records and other reports having to do with faculty, staff and students engaged in any activity allegedly related to antisemitism and anti-Israel issues, communications between university leadership, minutes of MIT Corporation and MIT faculty meetings, documents, budgets and communications related to diversity, equity and inclusion, and information on foreign funding, specifically from alleged Qatari sources.[30] That letter falsely accuses Plaintiff Michel DeGraff, treating his pro-Palestine and anti-genocide advocacy as "antisemitic," thereby implying that opposition to Israel and to genocide is inherently antisemitic.

43. The second letter, dated December 11, 2025 ("the second letter"), explicitly conflates anti-Zionism with antisemitism. Footnote 11 of that letter states that "The term "potential antisemitic incidents" should be understood to include any incidents involving the targeting of Jews, Judaism, Israel, Israelis, Zionism, or Zionists, or incidents otherwise identified as antisemitic."[31] Likewise, the Committee's October 31, 2024, Report, *Antisemitism on College Campuses Exposed*, ("the October 2024 Report") uses

---

[30] https://edworkforce.house.gov/uploadedfiles/3.8.24_mit_letter.pdf
[31] https://edworkforce.house.gov/uploadedfiles/mit_letter_12.11.25.pdf

"antisemitism" interchangeably with "anti-Israel," conflating a religion (Judaism) with a state (Israel).[32]

44. The Committee's expansive, viewpoint-discriminatory definition of antisemitism has been expressly contradicted by multiple federal courts, including one in this District. Indeed, these courts have rejected the characterization of anti-Zionism as antisemitism. On January 5, 2026, Judge Richard G. Stearns of the District of Massachusetts issued an order granting the motions to dismiss in the very lawsuit referenced by the Committee, *Sussman v. MIT,* 1:25-cv-11826 (D. Mass. 2025). In his order Judge Stearns explicitly stated that "anti-Israel sentiment is not, without more, antisemitic messaging." Order, *Sussman v. MIT,* 1:25-cv-11826, Docket #75 (D. Mass. Jan. 5, 2026). This judicial finding disproves the Committee's central premise that opposition to Israel or Zionism constitutes antisemitism and confirms that the Committee is unconstitutionally suppressing protected speech. *See also StandWithUs Ctr. for Legal Just. v. Massachusetts Inst. of Tech*., 2025 U.S. App. LEXIS 27390, at *18 (1st Cir Oct. 21, 2025, No. 24-1800); *Am. Assn. of Univ. Professors v. Rubio*, 802 F. Supp. 3d 120, n. 17 (D. Mass. 2025); *Landau v. Corp. of Haverford Coll*., No. 24-2044, 2025 U.S. Dist. LEXIS 1402, at *4-5 (E.D. Pa. Jan. 6, 2025); *Canel v. Art Inst. of Chicago*, 2025 U.S. Dist LEXIS 30309, at *24-25 (N.D. Ill. Feb. 20, 2025, No. 23 CV 17064); *Gerwaski v. Nevada ex rel. Bd. of Regents of the NV Sys. of Higher Educ.*, 2025 U.S. Dist LEXIS 84645, at *21-22 (D. Nev. May 5, 2025, No. 2:24-cv-00985-APG-MDC); *Newman v. Point Park Univ*., No. 2:20-cv-00204, 2022 U.S. Dist. LEXIS 60722, at *78-79 (W.D. Pa. Mar. 31, 2022). The Committee's continued pressure

---

[32]https://edworkforce.house.gov/uploadedfiles/10.30.24_committee_on_education_and_the_workforce_republican_staff_report_-_antisemitism_on_college_campuses_exposed.pdf

campaign is not merely rhetorical; it is document-driven and has already elicited internal productions from MIT.

45. In its October 31, 2024, Report, the Committee itself cites concrete evidence that, after the first letter and before the second, MIT produced internal documents to the Committee pertaining to the disciplining of students involved in pro-Palestine activism. In the MIT section of the Report, the Committee cites an "MIT Disciplinary Chart (amended), Mass. Inst. of Tech. (Oct. 22, 2024) (on file with Comm.)" (p. 81, fn. 433).[33] The Committee then uses this MIT-produced disciplinary material to publish granular assertions about MIT's discipline of student protesters, including: "Since October 7, 2023, [MIT] has not suspended a single student." (p. 81). This MIT production and the Committee's use of it underscore that the Committee's campaign is document-driven and that MIT's cooperation includes providing internal disciplinary information that can be used to stigmatize, pressure, and chill protected speech and association.

46. After the Committee published its October 2024 Report—and following investigations by MIT—some of these students were suspended and banned from MIT's campus. In at least one case, a student was expelled, in October 2025, for writing a scholarly essay "On Pacifism" in the student magazine *Written Revolution*.[34] Following the publication of that essay in November 2024, the then Vice President of Hillel (a pro-Israel organization, funded in part by Israel[35]), acting in his capacity as the Dean of Student Life, instituted

---

[33] https://edworkforce.house.gov/uploadedfiles/10.30.24_committee_on_education_and_the_workforce_republican_staff_report_-_antisemitism_on_college_campuses_exposed.pdf

[34] https://archive.is/Kyvus, https://web.archive.org/web/20250707175946/https:/hillel.mit.edu/aboutus/board-of-directors-2/, https://web.archive.org/web/20250708014230/https:/studentlife.mit.edu/about-dsl/people/david-randall/, https://www.counterpunch.org/2026/02/17/what-a-federal-court-taught-us-and-what-universities-must-learn-about-anti-zionism-vs-antisemitism/

[35] https://www.theguardian.com/world/article/2024/jun/24/israel-fund-us-university-protest-gaza-antisemitism; https://www.hillel.org/israel-guidelines/

disciplinary proceedings against the pro-Palestine student-author after the President of Grad Hillel—Will Sussman, again—had taken to X (formerly Twitter) to publicly accuse the student-author of being a potential "domestic terrorist." In his tweet, Sussman tagged MIT, the FBI and the Committee.[36] While the Committee's October 2024 Report does not include student names, the students undergoing disciplinary processes at MIT are identifiable.

47.  A few months before the October 2024 Report, Adam Lehman, the Chairman of Hillel, had appeared, in February 2024, at the Israeli Parliament (the Knesset) to report on Hillel "working with university administrators to get them to change policies to protect Jewish students and to make sure that Israel is not demonized on campus and that Jewish students can be safely Jewish and Zionist at the same time."[37] In that session at the Knesset, Lehman boasted of "a few signs of hope," suggesting that "we [Hillel] are going to prevail on campus just like Israel will prevail in its war here." These signs of hope include Hillel's power to change disciplinary processes at U.S. universities. Lehman cited MIT as an example of a university that "fully suspend[ed]" students advocating for justice in Palestine.[38]

48.  MIT's production of internal disciplinary information to the Committee is especially dangerous in the context of the Committee's willingness to convert allegations into official "findings" and to repeatedly target identifiable individuals and groups. Even where the Committee purports to anonymize, the combination of MIT-specific disciplinary records, detailed narratives, and the Committee's public framing foreseeably enables re-

---

[36] https://archive.is/Kyvus
[37] https://youtu.be/QeBr3Qc7qr8
[38] https://www.theguardian.com/world/article/2024/jun/24/israel-fund-us-university-protest-gaza-antisemitism

identification, doxing, harassment and retaliation—creating an ongoing and irreparable chilling effect on protected speech and association within the MIT community.

49. The second letter also demands the production of a wide range of confidential, non-public records concerning students, faculty and staff related to alleged antisemitism.[39]

50. The second letter cites political speech at MIT as evidence of a hostile environment. For example, the letter cites the alleged distribution of "terror maps" that it describes as "demarcating campus buildings linked to Jews and Israelis." However, what the Committee calls "terror maps" are maps that identify the sites of MIT's weapons- and surveillance-related projects in complicity with Israel's genocide of Palestinians in Gaza.

51. The second letter demands a vast array of documents and communications, since October 7, 2023, referring or relating to "antisemitism," "Jews," "Judaism," "Israel," "Palestine," or "Zionism."

52. The second letter also demands an anonymized chart of all complaints regarding "potential antisemitic incidents," which the Committee defines to explicitly include any "targeting" of "Israel," "Israelis," "Zionism" or "Zionists."

53. The March 17, 2026, Report and the Committee's second letter (in December 2025), like the first letter (in March 2024), falsely accuse Plaintiff Michel DeGraff and pro-Palestine students and co-workers at MIT as "antisemites." The Committee and its Chairman even treats as established facts allegations against Michel DeGraff by pro-Israel Plaintiffs in the *Sussman v. MIT* lawsuit. The first and second letters and the March 17, 2026, Report, like Chairman Walberg's March 19, 2026, *Daily Wire* essay, are all publicly posted on the Committee's official website.[40] Chairman Walberg's March 19, 2026 opinion essay

---

[39] https://edworkforce.house.gov/uploadedfiles/mit_letter_12.11.25.pdf
[40] https://edworkforce.house.gov/

repeats the same allegations in a national outlet, further converting accusations into state-backed stigma.[41]

54. Across these official communications, the Committee repeatedly identifies Plaintiff by name and casts him as "antisemitic" based on unverified allegations, treating Plaintiff as guilty until proven innocent and amplifying doxing-style accusations. The second letter also demands categories of records that would readily identify Plaintiff and his protected associations and viewpoints. These demands include broad requests for documents and communications since October 7, 2023, relating to "antisemitism," "Jews," "Judaism," "Israel," "Palestine," or "Zionism," as well as an "anonymized" chart of complaints. Given Plaintiff's unique public profile as an anti-genocide advocate at MIT and the specificity of the requested information, such records can be identified and used to single him out.

55. Again, the Committee's allegations are extraordinary in that they do not reflect any neutral fact-finding process. The Committee attributes assertions to hearsay and to adversarial sources, then republishes those assertions as "findings" in official communications, press materials, and staff reports—thereby converting rumor into state-backed stigma and foreseeable retaliation.

56. On information and belief, the Committee's investigation is ongoing. The Committee has issued repeated demands, published reports and public statements, and has not disclaimed further requests or subpoenas. Having already sent two letters, it is reasonably likely that the Committee will make additional demands—narrower and more identifying—seeking to obtain, disseminate and leverage private records about Plaintiff and others engaged in protected pro-Palestine advocacy.

---

[41] https://www.dailywire.com/news/the-profs-arent-alright-how-radical-faculty-fuel-the-rise-of-campus-antisemitism

57. On information and belief, the Committee, on the heels of the March 17, 2026, Report has sent a third letter to MIT asking for production of documents about Plaintiff, threatening to escalate with subpoenas if MIT does not oblige.

58. Absent prospective injunctive relief, Plaintiff faces imminent and continuing harm, including a chilled ability to speak, teach and associate; heightened risk of doxing, harassment and retaliation; and the ongoing threat that confidential records will be obtained and used to facilitate future adverse actions against him.

59. In seeking confidential student, faculty and staff records, the Committee is actively violating its targets' First Amendment rights and rights of privacy and due process, jawboning and seeking to retaliate against their speech and interfere with their freedom of association.

60. The October 2024 Report's citation of MIT's disciplinary production "on file with [the] Comm[ittee]" confirms that the risk of future production is not speculative: MIT has already produced sensitive, internal disciplinary material in response to the Committee's demands, and the Committee has demonstrated its intent to continue escalating its "investigation" through further requests, reports and public accusations.

61. Plaintiff therefore reasonably fears that, absent injunctive relief, additional productions will be sought and leveraged to identify, isolate and punish disfavored speakers, including Plaintiff.

62. For students, the harm from these disclosures is compounded by federal privacy protections: disclosure of student disciplinary records by MIT to the Committee violates students' rights under FERPA.

63. The Committee's demands and investigation directly target Plaintiff's constitutionally protected speech and academic freedom.

64. The Committee's definition of antisemitism—and thus its associated investigations—violates the Establishment Clause by privileging the beliefs of a minority of Jewish people who claim that Zionism is fundamental to their religion, thus prioritizing their religious beliefs over that of other Jews. For example, the second letter states: "The term 'potential antisemitic incidents' should be understood to include any incidents involving the targeting of Jews, Judaism, ***Israel, Israelis, Zionism, or Zionists***, or incidents otherwise identified as antisemitic."[42] This privileging of one contested religious interpretation—treating Zionism as religiously mandatory—mirrors Establishment Clause problems where government enforces one sectarian rule-set over others, *Commack Self-Service Kosher Meats, Inc. v. Weiss, 294 F3d 415, 429* (2d Cir 2002) (New York law required meat labeled "kosher" to be butchered according to Orthodox, not Conservative, Jewish rules).

65. The Committee's intention, which is congruent with that of the presidential administration, is to cleanse MIT and the academic world in general of both (i) pro-Palestine expression and criticism of Israel, and (ii) Palestinian students and their supporters. This is simultaneously a violation of the First Amendment and of the Massachusetts discrimination law.

66. "Government officials cannot attempt to coerce private parties in order to punish or suppress views that the government disfavors", *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187, 191 (2024).

---

[42] https://edworkforce.house.gov/uploadedfiles/3.8.24_mit_letter.pdf (emphasis added).

67. For purposes either of a standing analysis or injunctive relief, "[L]oss of First Amendment freedoms, even for minimal periods of time, constitute irreparable injury," *Elrod v. Burns*, 427 U.S. 347 (1976); *Students for Just. in Palestine v. Abbott*, No. 1:24-CV-523-RP, 2024 U.S. Dist. LEXIS 196180, at *29 (W.D. Tex. Oct. 28, 2024).

68. By complying with the Committee's demands without a subpoena, MIT acts as an active participant and co-conspirator in the violation of Plaintiff's fundamental rights, and breaches its contractual duties to protect his academic freedom and privacy. MIT's specific contractual breaches are detailed in "Specific Breaches" section below.

69. The Committee's project violates the First Amendment and constitutes national-origin and viewpoint discrimination, and it pressures MIT into discriminatory and retaliatory conduct prohibited by Massachusetts anti-discrimination law, including M.G.L.c. 151B.

70. The Committee, while invoking federal anti-discrimination law as rhetorical cover for its "antisemitism" inquisition, has weaponized such law and such "antisemitism" accusations in order to conduct an egregious campaign of discrimination against Palestinian students, faculty, staff and their supporters.

71. Plaintiff Michel DeGraff is explicitly named as a Defendant in a lawsuit referenced in the Committee's letter, which directly subjects him to public scrutiny and the Committee's retaliatory demands. The Committee's letter refers to the allegations in the lawsuit (*Sussman v. MIT*) as if they were established facts and as if DeGraff were to be considered guilty until proven innocent.[43] Yet these allegations are demonstrably false.

---

[43] https://www.middleeasteye.net/big-story/teach-linguistics-mit-zionist-lawsuit-shows-language-silence-israel-critics

72. The Committee's demands compel MIT to disclose private information that discourages Plaintiff from exercising his right to associate and speak on political and academic matters, in violation of the First Amendment.

73. MIT's compliance with the Committee's demands makes it an active participant in violating the First Amendment rights of Plaintiff, placing him and others at high risk of doxing, harassment and other forms of retaliation.

74. Plaintiff, as a result of the Committee's pressure and MIT's possible compliance, reasonably fears irreparable harm, including the chilling of his academic speech, damage to his reputation, and professional blacklisting.

*MIT's Contractual Promises and the Specific Breaches at Issue: Course Censorship, Retaliation Against Protected Speech, and Embargo of Videos Filmed by MIT OpenCourseWare at MIT Open Learning—All Under Political Pressure in Anticipatory-Compliance Mode*

75. The following are a small sample of a long series of specific breaches of contract that occurred on specific dates and through specific actions as documented in Plaintiff's complaint filed with the Massachusetts Commission Against Discrimination (MCAD) in May and July 2025.[44]

76. On December 5, 2023, Plaintiff, in keeping with his research and teaching agendas of nearly three decades,[45] proposed to MIT Linguistics a Special Topics elective seminar on language and linguistics in decolonization and liberation struggles—a key topic in his forthcoming book to be published by MIT Press.

---

[44] Also see https://mondoweiss.net/2025/04/i-faced-censorship-and-attacks-at-mit-for-trying-to-teach-about-palestine-this-reflects-the-rising-fascism-in-higher-education/ and https://thetech.com/2024/08/22/degraff-linguistics-for-domination
[45] http://mit.edu/degraff; https://archive.is/6MWzD; https://archive.is/07GD8; https://archive.is/YXzoc

77. On December 8, 2023, in a Zoom conversation scheduled to discuss Plaintiff's teaching in Fall 2024, Professor Dany Fox, head of MIT Linguistics, stridently disagreed with Plaintiff on the interpretation of key terms germane to his proposed seminar ("antisemitism," "colonialism," "From the River to the Sea, Palestine will be free," "homeland," "Intifada," "Indigenous," "genocide," "native," "resistance," etc.). Professor Fox even yelled at Plaintiff "You're out of your fucking mind" after Plaintiff drew linguistic parallels between Prime Minister Benjamin Netanyahu's dehumanizing language about Palestinians as "Amalek" in 2023 and that of German Nazis about Jews as "vermin" in the 1930s and 1940s. Prof. Fox also accused Plaintiff of antisemitism in response to Plaintiff's political stances on Palestine and his letter to University of Pennsylvania in which Plaintiff called out billionaire Zionist Jewish donors suppressing pro-Palestinian voices at the University of Pennsylvania.

78. In February 2024, as part of a long email exchange about my course proposal, Professors Danny Fox (MIT Linguistics Head), Sabine Iatridou and Donca Steriade (Directors of Graduate and Undergraduate Studies at MIT Linguistics) raised "questions of fit, given the linguistics curriculum" and stated that "the title of the class has led to genuine concerns about fit within the department."

79. Thereafter, in February through July 2024, MIT Linguistics subjected the proposal to an unprecedented *ad hoc* review—a first of its kind in at least the 28 years (1996–2024) that Plaintiff was a faculty member at MIT Linguistics. It's only after Plaintiff's proposal had been submitted that MIT Linguistics "formalized" a new course-approval process, with a three-member committee (Fox, Iatridou and Steriade), departing from established procedures and norms in Plaintiff's nearly three decades in the department. Among these

three members was the MIT Linguistics head (Professor Danny Fox) who had previously yelled profanities in disagreement with Plaintiff's political stances on Palestine and Israel.

80. On March 13, 2026, in an email message explaining the unprecedented level of scrutiny of Plaintiff's course proposal, Professor Iatridou wrote:

> "… You also wonder what might have changed to bring about this process of faculty discussions of courses, which we didn't have before (though I think it existed on paper but that's irrelevant).
>
> Well, what has changed is, the whole world it seems and definitely the atmosphere on campus. There are suspicions from all directions to all directions, some warranted some not, people worry how their ethnic backgrounds (even putting aside religious beliefs) will make others perceive them or react to them. This is a very real worry for faculty as well as students…"

81. On May 20, 2024 and again on July 19, 2024, this unprecedented *ad hoc* review committee denied Plaintiff's proposal citing lack of expertise, lack of curricular fitness, and too many guest speakers. Plaintiff was told that he could teach a Special Topics linguistics seminar about language and linguistics for decolonization and liberation in the context of *Haiti only—not in the context of Palestine and Israel*. This is a violation of MIT's contractual commitments to freedom of expression and academic freedom. This violation is all the more flagrant in light of the "Special Topics" rubric—*explicitly and purposefully reserved for topics not covered in the regular curriculum*—and in light of Plaintiff's established record of teaching and scholarship in the very field of language and power at the core of his course proposal. Plaintiff's work in this field has garnered the highest accolades in his profession as documented by MIT News in an article titled "*Professor Michel DeGraff*

*named a fellow of the Linguistics Society of America. Selection as LSA Fellow marks the highest honor in the field of linguistics.*"[46] This article includes congratulations from the MIT Linguistics head:

> "… Danny Fox, head of MIT Linguistics, celebrated the honor as recognition of DeGraff's multifaceted, socially-minded approach to his field, as well as recognition of his outstanding scholarship. 'It is good to see a professional organization like the LSA promoting scientists not just for their research, but also for the kind of activism that might accompany it: battling prevalent misconceptions about the nature of the world, identifying their detrimental consequences, and fighting for change…'…"

82. In August 2024, the Vice-Provost for Faculty gathered "a neutral panel of faculty" for an "independent review" of Plaintiff's course rejection. That review offered no transparency and no due process: Plaintiff was neither interviewed in the course of this review, nor told who was on this "neutral panel" and which documents were reviewed. The said "neutral panel," instead of comparing the review of Plaintiff's Special Topics seminar proposal with other similar proposals *within MIT Linguistics*, was charged with comparing the review of my course proposal with "processes utilized for these type of curriculum decisions throughout SHASS"—a comparison of the MIT Linguistics unprecedented *ad hoc* review with processes in the other 12 units in the entire School of Humanities, Arts & Social Sciences. Such comparison is invalid since each of these units has different procedures in place for evaluating their distinct course offerings (nearly half of these units, unlike MIT Linguistics, do not even offer graduate-level courses). Moreover, on

---

[46] https://news.mit.edu/2022/michel-degraff-linguistics-society-america-fellow-1013

information and belief, one senior colleague at MIT Linguistics, Professor Michael Kenstowicz, who had supported my right to offer the seminar and who had reached the conclusion that I was treated unfairly by the unprecedented *ad hoc* review committee, was *not* interviewed by the review committee organized by Vice-Provost Paula Hammond. Prof. Kenstowicz had also confirmed to me via email on July 31st, 2024, that he had

> "voted to allow the course to be so scheduled (as per our usual procedure) when this matter was first discussed at a faculty meeting last winter. I continue to believe that it should be so offered—for many of the reasons you have mentioned in your messages over the past nine months…"

83. After Plaintiff began writing email messages and opinion essays to protest the discriminatory nature of the rejection of his Special Topics seminar proposal (communications legally protected by Massachusetts General Law M.G.L.c. 151B), MIT retaliated by imposing economic sanctions, including withholding Plaintiff's salary increase beginning August 27, 2024, then extended the withholding on September 10, 2024 and October 3, 2024, invoking "misuse" of email and "Policies & Procedures" without identifying any specific violated rule and without providing fair process.

84. Beginning September 9, 2024, MIT Linguistics censored Plaintiff's academic announcements advertising the guest lectures in his People's Seminar / Speaker Series organized in lieu of the rejected course, again undermining MIT's contractual commitments to freedom of expression and academic freedom.

85. MIT breached its contractual promises of academic freedom, free expression and fair procedures by misapplying its own free-expression policies to punish Plaintiff's written speech. MIT invoked "time, place, and manner" constraints aimed at "organized protests"

to label Plaintiff's emails, social-media posts and published essays as "misconduct" and "disruption," and then used that characterization to impose adverse employment actions, including removal from his academic unit and financial consequences (cf. Dean Rayo's letters of August through November 2024). When Plaintiff, on October 6, 2024, requested from Dean Rayo identification of the specific policy or rule he allegedly violated, MIT failed to provide a clear, rule-based explanation—departing from promised procedural fairness and the implied covenant of good faith and fair dealing.

86. MIT further breached its contractual commitments to fair procedures and non-retaliation by retroactively recharacterizing Plaintiff's protected opposition as "spam" or "misuse" in order to justify punitive action after the fact, rather than applying clear, pre-existing standards in a consistent and good-faith manner (Dean Rayo's letters of August through November 2024).

87. On November 14, 2024, MIT removed Plaintiff from his academic unit and altered his status to "Faculty-at-Large," and later froze his salary for 2025–2026 and continued his exclusion from Linguistics, causing professional and economic harm inconsistent with MIT's promised procedures, fairness commitments, and protections against retaliation for protected expression and association.

88. MIT breached the implied covenant of good faith and fair dealing by penalizing Plaintiff for alleged "misconduct" (in effect, consisting of Plaintiff's protesting against perceived discrimination) and for failure to meet teaching obligations while simultaneously preventing him from teaching the proposed course in the academic unit where it belonged, thereby placing Plaintiff in a catch-22 and using that manufactured shortfall as a basis for adverse action.

89. MIT initiated and pursued an HR investigation of Will Sussman's complaint beginning December 16, 2024, requiring Plaintiff to incur legal expenses and to respond during his Christmas vacation with family under threat of discipline. The investigation was later dropped (after Sussman left MIT for the Manhattan Institute), reflecting MIT's departure from consistent, fair and non-retaliatory administration of its own policies and procedures. NB: This is the same Will Sussman who—alongside Lior Alon, "John Doe" and the Brandeis Center Coalition to Combat Anti-Semitism—filed the *Sussman v. MIT* lawsuit against MIT and Michel DeGraff. The complaint against DeGraff was dismissed by Judge Richard G. Stearns of the United States District Court for the District of Massachusetts.[47]

90. MIT breached its published policies and the implied covenant of good faith and fair dealing by administering discipline and related processes in a manner that created at least the appearance of conflict of interest and viewpoint bias—particularly where personnel affiliated with MIT's premier pro-Israel organization played roles in student-discipline structures during a period of heightened enforcement against pro-Palestinian advocacy. This structure undermined MIT's promised neutrality, fairness and procedural regularity in handling disputes involving protected expression and association.[48]

91. MIT further breached its contractual commitments to academic freedom and freedom of expression through MIT OpenCourseWare (OCW) at Open Learning by embargoing the videos OCW filmed of Plaintiff's Fall 2024 People's Seminar / Speaker Series on "Language and Linguistics for Decolonization and Liberation in Haiti, Palestine and Israel." MIT filmed all but one of the People's Seminar sessions in Fall 2024 pursuant to

---

[47] *Sussman v. MIT* 1:25-cv-11826 Docket #75 (D. Mass. Jan. 5, 2026)
[48] https://www.counterpunch.org/2026/02/17/what-a-federal-court-taught-us-and-what-universities-must-learn-about-anti-zionism-vs-antisemitism/

logistics planned with OCW leadership to protect student privacy. Plaintiff had collaborated with OCW on a number of prior projects, all published on the OCW website and YouTube channel and all centered around issues of language and power in diverse locales.[49] Yet, in this particular case involving Palestine, OCW imposed an embargo and withheld publication of the videos it had filmed. Plaintiff repeatedly sought updates and access, including after an OCW Faculty Advisory interaction in May 2025 where OCW leadership suggested the project had been put "on pause," and Plaintiff thereafter received extended silence despite repeated follow-ups via email messages to the Director of MIT Open Course Ware and the Senior Associate Dean for Open Learning. Plaintiff publicly protested this embargo at MIT's Festival of Learning on January 28, 2026, noting that OCW had filmed the sessions but "put an embargo on the videos they filmed," notwithstanding OCW's motto "UNLOCKING KNOWLEDGE" and the "OPEN" in "Open Learning."

92. On February 13, 2026, when Plaintiff met with MIT's Vice Provost for Open Learning, the latter acknowledged that the embargo may be driven by *concerns of OCW leadership about protecting MIT from political and financial repercussions arising from the seminar's viewpoint on Palestine/Israel*. This is an explicit example of the "Palestine Exception" and of the consequences of government's repression of teaching and scholarship about Palestine. In this particular case, MIT's stated commitments to "unlocking knowledge" and "open learning" yield to viewpoint-based anticipatory

---

[49] https://ocw.mit.edu/courses/24-912-black-matters-introduction-to-black-studies-spring-2017/; https://ocw.mit.edu/courses/24-908-creole-languages-and-caribbean-identities-spring-2017/; https://ocw.mit.edu/courses/24-s96-linguistics-and-social-justice-language-education-and-human-rights-fall-2021/; https://chalk-radio.simplecast.com/episodes/unpacking-misconceptions-about-language-identities-with-prof-michel-degraff; https://chalk-radio.simplecast.com/episodes/honoring-your-native-language-with-prof-michel-degraff-Dqye_pj4

suppression, i.e., LOCKING knowledge and CLOSING learning. This too amounts to yet another breach of contract on MIT's part.

***The Committee is a Perfect Storm of Islamophobia, Christian Fundamentalism, Personal Vindictiveness, and Malicious Disregard of Civil Liberties and of the First Amendment***

93. The Committee's letters and reports targeting Plaintiff for his teaching and activism about Palestine did not arise in a vacuum. They represent an escalating series as part of a broader campaign. As described below, the Committee's approach reflects viewpoint hostility toward pro-Palestinian speech and a reckless disregard for civil liberties, including the First Amendment. The Committee, by its majority members' own statements and actions, publicly acts on, endorses and enables Islamophobia, Christian fundamentalist goals for government action, and brutal disregard for the civil rights and liberties of the Palestinian, Arab and Muslim students and co-workers, and their allies, whom it claims to be investigating. [50]

94. The Committee has twenty Republican members, constituting the Committee's decision-making majority. The following paragraphs set forth statements and actions by all of them.

95. Plaintiff asserts that this evidence would be admissible at trial under Fed. R. Ev. 406, which states: "Evidence of a person's habit or an organization's routine practice may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice. The court may admit this evidence regardless of whether it is corroborated or whether there was an eyewitness", *cf. Vil. of Arlington*

---

[50] The New York Times, in a March 19, 2026, opinion by its editorial board, stated: "The attacks against Islam and Muslims from Mr. Trump and other Republicans are shameful. They are filled with lies. They deserve denunciation from all Americans, regardless of politics or religion." The article includes examples of blatantly bigoted statements by other legislators not serving on the Committee. https://www.nytimes.com/2026/03/19/opinion/anti-muslim-islamophobia-trump-republicans.html?unlocked_article_code=1.UVA.MT80.jZTu_VGNA1DZ

*Hgts. v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 267 (1977) "[H]istorical background... is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes"; *Carroll v. Trump,* 124 F.4th 140, 168 (2d Cir 2024) (admitting the "Access Hollywood" tape under Rule 406).

96. The Committee's Chairman, Tim Walberg, said at a March 2024 town hall meeting in Dundee, Michigan, in reference to Gaza, "We shouldn't be spending a dime on humanitarian aid. It should be like Nagasaki and Hiroshima. Get it over quick."[51]

97. The Committee's former chair and current member, Representative Virginia Foxx, rather carelessly confessed in an X post on September 12, 2025, to having secretly attempted to obtain the expulsion of a Columbia student: "Khymani James...was not expelled. Nothing was done. @Columbia you have failed again, again, and again."[52]

98. Foxx told the *New York Times*: "The people here believe that the Jews are God's chosen people, and I grew up in the Baptist Church believing that....There are verses in the Bible that ministers will quote, that if you bless the Jewish people you will be blessed. If you curse the Jewish people you will be cursed."[53]

99. Member Rick Allen of Georgia quoted the same verse of the Bible of which Ms. Foxx was apparently thinking, to then-Columbia President Minouche Shafik, who is Egyptian, Muslim, and a person of color, at the Committee's April 17, 2024, hearing: "[A]re you familiar with Genesis 12:3?... It was a covenant that God made with Abraham and that

---

[51] https://www.nytimes.com/2024/03/31/us/politics/tim-walberg-gaza-nagasaki-hiroshima.html?unlocked_article_code=1.UVA.K9QR.hrUAjNsriYv5
[52] https://www.nytimes.com/2024/04/16/us/virginia-foxx-harvard-antisemitism.html?unlocked_article_code=1.UVA.dZIj.3WBp-LLh3IUn
[53] https://archive.is/z8wUP

covenant was real clear. If you bless Israel, I will bless you. If you curse Israel, I will curse you... Do you want Columbia University to be cursed by [the] God of the Bible?"[54]

100. Committee member Joe Wilson said: "…'These stones and trees will say oh, Muslim, there is a Jew behind me, come and kill him.' That's their ideology. Free Palestine from the river to the sea is a code for death to Israel, death to America. We know that anti-Zionism is antisemitism."[55]

101. As for Committee member Glenn Grothman: "Amid the ongoing war between Hamas and Israel, Wisconsin congressman Glenn Grothman wants to prohibit Palestinians from entering the U.S. 'I think there are plenty of places in that part of the world that could take them before the U.S.' said Grothman. 'Egypt, Syria, Lebanon, none of which want them, by the way, and we have to wonder why none of them want them. Or perhaps they can just go rebuild Gaza after Israel goes through the next couple of weeks, and clears out the more radical Hamas types.' In an interview posted Monday to the social media platform X (formerly known as Twitter), Grothman said Palestinians have been raised to not like Jewish people. The 6th District Republican said he may introduce a bill or amendment to prohibit all Palestinians from entering the U.S., not just members of Hamas."[56]

102. Prominent Committee member Elise Stefanik has been particularly outspoken in accusing all segments of pro-Palestinian activism in this nation's universities of being terrorist supporters, calling Professor Mohamed Abdou, then at Columbia, an "extreme pro-terror professor",[57] asking the FBI to investigate a Columbia student group, CUAD,[58] and also

---

[54] https://www.rev.com/transcripts/university-antisemitism-hearing
[55] https://congress.gov/119/chrg/CHRG-119hhrg61619/CHRG-119hhrg61619.pdf
[56] https://whbl.com/2023/10/24/congressman-glenn-grothman-doesnt-want-palestinians-in-u-s/
[57] https://archive.is/MCHz3
[58] https://files.constantcontact.com/81b76c35801/cf6425c5-1967-410a-a0f7-a5d1f686501b.pdf

requesting the Treasury Department to investigate America's preeminent Muslim civil liberties organization, the Council on American-Islamic Relations (CAIR), " to determine if the organization is being funded or directed by Hamas or any other foreign terrorist group."[59]

103.  Member James Comer "is continuing to investigate organizations reported to be funding and organizing illegal actions, including at institutions of higher education, by individuals spreading pro-Hamas propaganda and engaging in antisemitic harassment and civil rights violations against Jewish students. In a letter to National Students for Justice in Palestine (National SJP)... Chairman Comer is now requesting documents and information to better understand how pro-Hamas propaganda and illegal encampments are being funded and supported across the United States."[60]

104.  Committee member Burgess Owens, before being elected to Congress, promoted a baseless conspiracy theory in 2016, alleging that "Khizr Khan, a Gold Star father whose son Army Capt. Humayun Khan was killed in Iraq in 2004" and who "spoke about his son at the 2016 Democratic National Convention.... co-founded an academic periodical that seeks to defend the arcane Sharia law to a legal system based on Western jurisprudence" and that "Khan's legal work may have helped the 9/11 hijackers enter the United States." Owens also claimed that, by "making it easy for Saudis, Emiratis, and others to game the U.S. immigration system, Khizr Khan shares in some of the responsibility for his son's death."[61]

---

[59] https://stefanik.house.gov/2025/10/stefanik-and-cotton-send-letter-to-treasury-secretary-bessent-requesting-investigation-into-the-council-on-american-islamic-relations

[60] https://oversight.house.gov/release/comer-continues-to-investigate-groups-funding-and-organizing-illegal-encampments-and-pro-hamas-activities-in-the-united-states%EF%BF%BC/

[61] https://www.mediamatters.org/alex-jones/house-candidate-burgess-owens-frequently-promoted-content-alex-jones-including-anti

105. Member Mary Miller, mistaking for Muslim a Sikh chaplain invited to say a prayer to open a House session, "published—then deleted—a post on X saying that Giani Singh... should not have delivered the House's morning prayer... and that it was 'deeply troubling' someone of that faith had been allowed to lead prayer in the House and it 'should never have been allowed... America was founded as a Christian nation, and I believe our government should reflect that truth, not drift further from it... May God have mercy."[62]

106. Committee member Kevin Kiley described "an expansive network of outside groups partners with school districts to promote the use of instructional material that traffics in antisemitic tropes. Such groups often advance foreign interests and an anti-Israel agenda."[63]

107. Committee member Michael Rulli said that "Israel gave the Palestinian people the opportunity to turn Gaza into a bastion of freedom and economic prosperity. They chose to elect Hamas. The consequences of those decisions are not America's problem."[64]

108. Member Bob Onder, truly on the extreme fringe of all this hate speech, claimed that the Biden administration had allocated "…'$50 million for condoms in Gaza, which were being used to float IEDs into Israeli territory.... When pressed... to provide evidence for this claim, Onder admitted he hadn't personally verified the information but said it came from 'sources that I trust, both congressional sources and administration sources.'… "[65]

109. Committee member Michael Baumgartner said as a state legislator: "I want to prohibit (BDS) at the state legislator level and say it is illegal and that way I can just shut down

[62] https://www.theguardian.com/us-news/2025/jun/06/us-house-prayer-republican-mary-miller
[63] https://edworkforce.house.gov/news/documentsingle.aspx?DocumentID=412733
[64] https://archive.is/Ni6Ac
[65] https://www.ksdk.com/article/news/politics/national-politics/gop-congressman-stumbles-on-gaza-aid-claims-in-heated-exchange-over-trumps-funding-freeze/63-13d3a0f3-5b3e-44cf-86b4-a23c449d4ef1

these conversations and everybody can focus on teaching class and educating rather than being a politically-correct weapon."[66]

110. Member Mark Harris, "formerly the senior pastor of Charlotte's First Baptist Church, claimed Islam was 'dangerous' and the work of Satan. He also said peace between Israel and the Palestinians could not be achieved until Muslims and Jews accepted Jesus Christ as their savior. 'There is a satanic trinity of the dragon, the beast, and the false prophet. Satan is always a counterfeit,' Harris said. 'Listen to me, that is why the religion of Islam is so dangerous. It is the great counterfeit of our generation'…"[67]

111. Committee member Randy Fine, described by CNN as "a Jewish first-term congressman who was known in the Florida Legislature as 'The Hebrew Hammer' and often makes Islamophobic remarks on social media," recently became notorious for posting that "the choice between dogs and Muslims is not a difficult one."[68] Fine also wrote: "We need more Islamophobia, not less. Fear of Islam is rational."[69]

112. Lisa McClain is one of the rare Committee members who's not on record with any explicit Islamophobic utterance, but she voted (along with all the other Committee members then serving in Congress) for House Resolution 883 in 2024 which held that "the slogan 'from the river to the sea, Palestine will be free' is an antisemitic call to arms with the goal of the eradication of the State of Israel."[70]

---

[66] https://mynorthwest.com/local/senator-baumgartner-bds-bill/500618
[67] https://www.cnn.com/2018/11/02/politics/kfile-mark-harris-story

[68] https://www.nytimes.com/2026/02/17/us/politics/randy-fine-muslim-islamophobic-democrats.html?unlocked_article_code=1.UlA.jSPl.SbbfWyL67aRQ
[69] https://archive.is/qfusy
[70] https://www.congress.gov/bill/118th-congress/house-resolution/883

113. Committee member Julia Letlow voted for House Resolution 894 of 2023, which approves the vague and overbroad IHRA standards for antisemitism and states that "the slogan 'From the River to the Sea'... is a rallying cry for the eradication of the State of Israel and the Jewish people."[71]

114. Member Ryan Mackenzie agreed with other Committee members, at a meeting at which the President of Haverford was questioned, that funding should be withheld from universities declining to reveal information on student conduct proceedings.[72] "Other Republicans endorsed the idea of funding cuts for schools that refuse to disclose punishments, saying Congress should explore the issue. Rep. Ryan Mackenzie of Pennsylvania said it should be a baseline for receiving funding."[73]

115. Member Glenn Thompson participated in grilling then UPenn President Liz Magill at the December 5, 2023, hearing which would lead to her forced resignation: "Nowhere in the United States have these hateful and divisive ideas been more prevalent or have found a safer home than on college campuses. ... [I]t is impossible for a faculty member to support BDS and treat Israeli academics fairly. Can you tell this Committee unequivocally that no such discrimination has taken place?" Mr. Thompson advocated for "not giving such [BDS supporters] administrative powers" within the university.[74] At another hearing, questioning the President of Georgetown, Mr. Thompson said, in classic McCarthyism fashion: "In a social media post, the Associate Director of the Bridge Initiative of Georgetown, Mobashra Tazamal, reposted a statement that said Israel has been recreating Auschwitz in

---

[71] https://www.congress.gov/bill/118th-congress/house-resolution/894/text
[72] Haverford won dismissal of an antisemitism lawsuit, on the grounds that anti-Zionism is not antisemitism, *Landau v. Corp. of Haverford Coll.*, No. 24-2044, 2025 U.S. Dist. LEXIS 1402, at *4-5 (E.D. Pa. Jan. 6, 2025).
[73] https://whyy.org/articles/haverford-college-antisemitism-congressional-hearing/
[74] https://www.congress.gov/118/chrg/CHRG-118hhrg56239/CHRG-118hhrg56239.pdf

Gaza for two years. Do you believe it's appropriate for a Georgetown-affiliated scholar to publicly endorse a statement comparing Israel actions in Gaza to the evil of Auschwitz?"[75]

116. Member James Moylan, speaking on the House floor, endorsed violence against Muslim people by uncritically repeating and endorsing an Islamophobic narrative on the House floor: "Two weeks ago, coordinated mobs roamed the streets of Amsterdam, attacking Israelis in town for a soccer match, in a chilling, premeditated assault. Dozens of people were injured, and scores were running and hiding in fear."[76] Mr. Moylan omitted the fact that the supporters of Maccabi, the Israeli team, had committed the first violent acts of the day. NBC reported: "At 1 p.m. local, a large number of Maccabi supporters gathered in the city's central Dam Square...Video shared on social media and geolocated by NBC News showed Maccabi fans chanting anti-Arab slogans in front of the square's National Monument. Later Maccabi fans could be seen singing 'Death to the Arabs' and 'Let the IDF win. We will f--- the Arabs,' as well as tearing down a... Palestinian flag." The Maccabi fans attacked and vandalized taxis (whose drivers apparently were, or were thought to be, Arab).[77] "Footage has also emerged of Maccabi supporters close to Amsterdam central railway station setting off fireworks, chanting anti-Palestine slogans and taking iron scaffolding tubes and wooden planks from a building site to use as weapons. Other footage shows Maccabi fans running through the streets swinging belts."[78] "[A] report released by the mayor's office earlier this week, compiled with significant

[75] https://www.rev.com/transcripts/university-antisemitism-hearing
[76] https://www.congress.gov/118/crec/2024/11/20/170/172/CREC-2024-11-20-pt1-PgH6133.pdf
[77] https://www.nbcnews.com/news/world/violence-surrounding-soccer-match-israeli-dutch-teams-unfolded-rcna179572
[78] https://www.theguardian.com/world/2024/nov/11/what-happened-amsterdam-israeli-football-fans

input from police investigators, indicates it was Israeli fans who initiated the first attacks, which then spiralled.[79]"

117.  The Committee itself has similarly endorsed violence against Arab and Muslim students at Columbia. In January 2024, two Columbia students who were ex-members of the Israeli military disguised themselves, entered a pro-Palestinian student demonstration, and sprayed protesters with a "foul smelling" substance which victims believed to be a military crowd control chemical known as "skunk spray" and which resulted in multiple emergency room and hospital visits. Columbia initially suspended the two perpetrators, but under pressure from various outside actors including the Committee, ending up reversing the sanctions, and (astonishingly) paying the perpetrators several hundred thousand dollars in settlement.[80]

118.  In the October 31, 2024, Report *Antisemitism on college campuses exposed*, the Committee devotes pages 48-57 to a section excusing, justifying and minimizing the attack, titled: "The Columbia administration failed to correct false narratives of a 'chemical attack' that were used to vilify Jewish students, but imposed disproportionate discipline on the Jewish students involved."[81] This initiative by the Committee beggars the imagination, shouting Islamophobia, viewpoint discrimination and disparate treatment to anyone who will listen.

119.  Given that the Committee demands maximum punishment for anyone who merely utters the words "From the river to the sea, Palestine shall be free," the Committee's indulgence

---

[79] https://www.cbc.ca/news/world/amsterdam-israeli-soccer-fans-violence-1.7383558
[80] https://www.theguardian.com/us-news/2024/nov/01/columbia-student-protest-lawsuit
[81] https://edworkforce.house.gov/uploadedfiles/10.30.24_committee_on_education_and_the_workforce_republican_staff_report_-_antisemitism_on_college_campuses_exposed.pdf

is quite shocking as to students who assaulted their classmates of color by spraying them with an unknown substance the Committee describes as "novelty 'fart spray'" (p. 48). Rather than regarding the incident as an instance of violent Islamophobia, the Committee flips the script, accusing Columbia of antisemitism: "The false narrative that Israeli students perpetrated a 'chemical attack' with 'skunk spray' is more than an example of disparate disciplinary treatment: Columbia's failure to correct the record allowed this false narrative to be used by antisemitic students and faculty to vilify Israeli students and call for their exclusion in hateful chants, fliers, and media appearances" (p. 50). "The Columbia administration... imposed disproportionate discipline on the Jewish students involved" (p. 2). The message could not be clearer, namely that violence against people who look like Plaintiff and who advocate for justice in Palestine is acceptable.

### *MIT is Not an Antisemitic Environment*

120.  There are many Jewish members of the MIT community who do not believe it is an antisemitic environment—for example, MIT students who are part of the group *Jews for Collective Liberation*, and MIT faculty who are part of the group *Concerned Jewish Faculty*.[82]

121.  Those who claim that MIT is an antisemitic community, including the Committee, are using a controversial, overbroad and unconstitutional definition of antisemitism, which conflates anti-Zionism, and in fact any criticism of Israel or support of the Palestinian people, with antisemitism.

---

[82] https://jcl.mit.edu/, https://www.concernedjewishfaculty.org/

122.  The Committee's letters clearly spell out that this is the definition of antisemitism being used by the Committee, which has also made this clear in other statements, reports and press releases.

123.  Many American Jews, including members of MIT, are horrified by Israeli violence against Palestinians and the depravity of anti-Palestinian racism in Israeli society, and they regard themselves as anti-Zionist and as supporters of the Palestinian people.[83]

124.  The Committee's project implies that half or more of the American Jewish population are themselves antisemites—an absurdity.

125.  This harassment of American Jews who do not fit a preconceived mold is itself a form of antisemitism.

126.  Jewish and non-Jewish faculty, staff and students at MIT have noted that what have been alleged to be instances of antisemitism at MIT involve antipathy toward or criticism of Israel, not bias against Jewish people.

127.  On information and belief, the Committee is using the excuse of purporting to detect antisemitism (even among Jewish people) as an excuse to transform MIT and other universities into a right-wing model, without diversity and without pedagogy critical of the United States or Israel or perceived as "leftist" or "woke."

128.  Members of the Committee have, during hearings, in virtually the same breath in which they condemned antisemitism, also attacked DEI and claimed the universities lack conservative voices.

---

[83] *See, e.g.*, https://jcl.mit.edu/, https://www.concernedjewishfaculty.org/; https://www.jewishvoiceforpeace.org; https://www.academicsforpeace.org/; https://rabbis4ceasefire.com/about/; https://www.ifnotnowmovement.org/

*The Committee's Investigation and MIT's Anticipatory Compliance and Ongoing Cooperation
with the Investigation Violate the First Amendment*

129. The Committee and the Trump Administration have worked hard to create a hostile environment, in the nation as at MIT, in which individuals expressing criticism of Israel or support of Palestine are often execrated as antisemites and supporters of terrorism.

130. The Committee has made statements about Plaintiff that have exposed Plaintiff to harassment and threats.

131. The Committee's Chairman is a political ally of Will Sussman, the plaintiff in *Sussman v. MIT*.[84] Both of them are engaged in a witch hunt against educators from K-12 to university expressing support for Palestinian human rights, opposition to genocide, or criticism of Israel.[85]

132. Public communications on X (formerly Twitter) further demonstrate the close alignment between Sussman and Chairman Walberg and the Committee. On information and belief, Sussman posted on X praising Chairman Walberg's Committee work targeting alleged "antisemitism" in K–12 education, tagging Chairman Walberg directly.[86] Similarly, in October 2024, Sussman tagged the Committee when accusing a pro-Palestine PhD student of being a potential "domestic terrorist."[87] This accusation promptly led to an investigation by MIT's Committee on Discipline, started by the then Vice-President of Hillel acting in

---

[84] https://x.com/realwillsussman/status/1993158547077734884
https://x.com/realwillsussman/status/1867331941109772560
https://x.com/EdWorkforceCmte/status/1810706702318117307
https://x.com/repwalberg/status/1879967885369475484
[85] https://x.com/realwillsussman/status/1993158547077734884
https://x.com/EdWorkforceCmte/status/1810706702318117307
[86] *See, e.g.* https://x.com/realwillsussman/status/1867331941109772560 ;
https://x.com/realwillsussman/status/1993158547077734884.
[87] https://archive.is/Kyvus

his capacity of MIT's Dean of Student Life.[88] This investigation eventually led, in October 2025, to the student's expulsion from MIT—MIT's most severe disciplinary measure.[89]

133.  The Committee's official account publicized Sussman's complaint that "current federal law does not adequately protect him or other Jewish students against forced anti-Israel, anti-American political activity," demonstrating ongoing coordination and mutual amplification between Sussman's public pro-Israel and anti-Palestinian advocacy and the Committee's germane agenda.[90]

134.  The Committee's project is a bigoted one, seeking to eliminate all Palestinian, Arab and Muslim students, and anyone supporting and associating with them, from MIT and from the academic world generally.

135.  MIT is complicit in the Committee's project by turning over confidential files, and by giving in to the pressure to harass, surveil, jawbone and sanction students, staff and faculty.

136.  MIT privileges one putative protected class, Jews who assert that Zionism is an aspect of their religion, over everyone else, including Jewish people who oppose the actions of Israel and the Zionist political philosophy.

137.  Receiving a letter from the Committee is inherently coercive. The Committee's letter echoes other actions by this Administration which has used similarly false assertions of antisemitism to cancel federal grants and contracts to universities, revoke their ability to accept international students, and even to threaten to remove their accreditation. A false

---

[88] https://web.archive.org/web/20250707180536/https://web.mit.edu/directory/?id=drandall&d=mit.edu; https://web.archive.org/web/20250707175946/https://hillel.mit.edu/aboutus/board-of-directors-2/
[89] https://fnl.mit.edu/january-february-2026/a-student-expulsion-at-mit-questions-about-the-mit-disciplinary-process/
[90] See, e.g., https://x.com/EdWorkforceCmte/status/1810706702318117307

accusation that MIT tolerates a hostile antisemitic environment may also result in fewer students accepting offers to attend, and in donors canceling projects or withholding funds.

138. MIT, like other universities named or contacted by the Committee, is apparently intimidated by the Committee's attention.

139. MIT was not required to turn over confidential information and faculty files to the Committee. It could have refused voluntary compliance pending a subpoena or sued the Committee itself, citing academic freedom, freedom of speech and Massachusetts anti-discrimination law (including M.G.L.c. 151B), or MIT's Statement on Freedom of Expression and Academic Freedom.

140. Instead, MIT has chosen to comply with the Committee's requests, disclosing confidential student and faculty files, and possibly staff files as well, harassing, jawboning and surveilling members of its community, and investigating and sanctioning students for their pro-Palestine expression and criticism of Israel.

141. The Committee's conduct is not limited to passive "information gathering." By publicly accusing identified or identifiable MIT affiliates of antisemitism while simultaneously demanding records about them, the Committee creates foreseeable pressure on MIT to discipline, marginalize and isolate those individuals, thereby chilling speech and burdening association. This is classic "jawboning": informal coercion that achieves censorship and retaliation without subpoenas or adjudication.

142. The fact that MIT is being bullied, threatened and pressured by the Committee does not create a defense to Plaintiff's causes of action or let MIT off the hook for its violations of Plaintiff's rights as a member of the MIT community. Indeed, the Court in *Khalil v.*

*Columbia, supra,* denying Columbia's motion to dismiss, identified a fact issue as to whether government coercion makes a private university into a state actor.

### The Committee's Project Fuels Discrimination and Retaliation at MIT

143. Plaintiff's freedom of association has been infringed, as it is no longer safe for him to associate and share ideas and companionship with Palestinian students and co-workers without becoming the target of hostile attention.

144. Viewpoint discrimination infringing the First Amendment violates Massachusetts anti-discrimination law where members of a protected class are associated with a particular viewpoint with which their institution disagrees, resulting in the selective imposition of sanctions or retaliation targeting members of that class versus non-members. M.G.L.c. 151B.

145. Similarly, it is an act of racism or discrimination to automatically assign certain opinions or viewpoints to members of a protected class, as in the Committee's presupposition that being Jewish is equivalent to being pro-Israel which paradoxically and counterfactually excludes anti-Zionist Jews from the class of Jews.

146. MIT has engaged in both types of discrimination and retaliation prohibited by M.G.L.c. 151B. Prospective injunctive relief is necessary to prevent recurrence of the Committee's demands and MIT's pressured compliance, which together will continue to inflict irreparable harm.

147. The Plaintiff has come to expect hatred, threats and punishment at MIT for mentioning Gaza or Israel on campus or in his own social media. In November 2023, he was verbally assaulted by MIT faculty members at an MIT-wide faculty meeting when he mentioned Israel's genocide in Palestine in the context of a then recently launched initiative "against

hate" that prioritized antisemitism over anti-Palestinian, anti-Arab and anti-Muslim hate.[91] In December 2023, in a Zoom conversation, the MIT Linguistics section head (Prof. Danny Fox) cursed at Plaintiff ("You're out of your fucking mind") after Plaintiff drew linguistic parallels between Prime Minister Benjamin Netanyahu's dehumanizing discourse against Palestinians as "Amalek" in 2023 and that of German Nazis dehumanizing Jews as "vermin" in the 1930s and 1940s.[92]

148.  MIT has also retaliated against Plaintiff for his protected speech opposing discrimination. *See* M.G.L.c. 151B. For example, in Fall 2024, the Dean Agustín Rayo of MIT's School of Humanities, Arts and Social Science (SHASS) withheld a pay raise from Plaintiff and removed him from his department after Plaintiff protested—*in email, social media and opinion essays*—MIT Linguistics' rejection of his course proposal. The Dean's office falsely characterized Plaintiff's protests—duly protected speech—as "misconduct," "disruption," and a violation of "time, place, and manner" restrictions on expression.

149.  MIT's own written policies underscore the impropriety of this approach. [93] As reflected in Dean Rayo's communications, MIT invoked "time, place, and manner" limits on "organized protests" from MIT's Free Expression / Academic Freedom materials to characterize Plaintiff's written opposition—*emails, social-media posts and published essays*—as "misconduct" and "disruption," *despite the absence of any physical obstruction or interference with Institute operations*. Plaintiff specifically requested that MIT identify

---

[91] https://fnl.mit.edu/november-december-2023/standing-together-against-hate-from-the-river-to-the-sea-from-gaza-to-mit/

[92] https://thetech.com/2024/08/22/degraff-linguistics-for-domination
https://mondoweiss.net/2025/04/i-faced-censorship-and-attacks-at-mit-for-trying-to-teach-about-palestine-this-reflects-the-rising-fascism-in-higher-education/

[93] https://policies.mit.edu/policies-procedures/120-relations-public-use-mit-name-and-facilities-use/127-protests-demos

what, precisely, constituted "misconduct" or "misuse" in his writings, but MIT did not provide a rule-based explanation. This departure from MIT's own policy framework and basic procedural fairness is part of the pattern that supports Plaintiff's contractual and statutory claims.

150. Dean Rayo also directed Plaintiff to stop communicating with MIT community members and the public about what Plaintiff perceived as discrimination and retaliation. Such gag-style instructions conflict with MIT's published commitments to free expression and academic freedom, and they further chilled Plaintiff's protected speech and association.

151. Plaintiff has been stalked by the MIT Israel Alliance, received insults and threats, including to his email addresses and social media. These attacks seem part of the sort of witch hunts validated by the Committee's project.

152. MIT's Linguistics Department prevented Plaintiff from advertising his People's Seminar / Speaker Series on *Language and Linguistics for Decolonization and Liberation in Haiti, Palestine and Israel* ("People's Seminar") in the MIT Linguistics Newsletter ("WHAMIT") in Fall 2024. Eventually the WHAMIT editors even went so far as to dissolve the Newsletter instead of agreeing to advertise the Speaker Series. Once the People's Seminar was over, WHAMIT was revived.

153. MIT OpenCourseWare (OCW) at MIT Open Learning (OL) has refused to publish the videos of Plaintiff's People's Seminar based on concerns about protecting MIT from potential political and financial repercussions—even though the logistics of the seminar were established in collaboration with the OCW and OL leadership. In effect, OCW's and OL's mission of "unlocking knowledge" and "opening learning" is now subordinated to

institutional risk management tied to the viewpoint expressed in Plaintiff's Peoples's Seminar, thus *locking* knowledge and *closing* learning about Palestine and Israel.

154. When Plaintiff responded on X and email to attacks, insults and threats on X by then-MIT graduate student Will Sussman (Tim Walberg's political ally) and his X followers, MIT provided Sussman with cover and then launched an investigation of DeGraff, based on Sussman's specious complaint that DeGraff had harassed him. Yet it was DeGraff who suffered harassment: Sussman's avalanche of insults and threats created insecurity around DeGraff and his family to the point that Cambridge Police had to provide extra protection to DeGraff's home. In sharp contrast, MIT has not investigated pro-Israel faculty who have publicly harassed students of color—including one who publicly insulted Black and Brown students on social media, and another who publicly bullied a Brown female student by accusing her of "making up" allegations of sexual assault. In those cases, the faculty were only "spoken to," demonstrating a pervasive pattern of discriminatory enforcement.[94]

155. MIT punishes Palestinian, Arab and Muslim students and their supporters more severely than others similarly situated, for equivalent alleged violations of student code.[95]

156. Palestinian, Arab and Muslim students and supporters are also viewed in a biased way as being dangerous, violent and prone to antisemitism and supporters of terrorism — an MIT Provost even compared them to rapists![96]

157. MIT Police have surveilled and harassed pro-Palestinian students and co-workers and subjected them to excessive force.[97] For example, "MIT Police placed [a student protesting

---

[94] https://mondoweiss.net/2025/04/i-faced-censorship-and-attacks-at-mit-for-trying-to-teach-about-palestine-this-reflects-the-rising-fascism-in-higher-education/

[95] https://fnl.mit.edu/september-october-2024/how-the-rights-of-mit-student-protesters-were-undermined-and-how-to-fix-things-moving-forward/

[96] https://thetech.com/2024/06/13/degraff-linguistics-pro-pal

[97] See UN Rapporteurs' letter to MIT President Sally Kornbluth: https://spcommreports.ohchr.org/TMResultsBase/DownLoadPublicCommunicationFile?gId=29849

MIT's complicity in Israel's genocide in Gaza] under involuntary psychiatric hold... The psychiatrist's evaluation, when the student arrived at the hospital, was that 'there was nothing in the report that was worth [the hold]...'[98] All of this contributes to a sense of unsafety on campus.

158. When MIT police dismantled the MIT Scientists Against Genocide Encampment (SAGE), on Friday, May 10, 2025, Israeli and American flags were handled with care while Palestinian flags were discarded and students' artwork was destroyed.

159. MIT issued interim suspensions to 23 individuals following the dismantling of encampments at MIT. Five of those students were misidentified. At a subsequent faculty meeting on May 17, 2024, multiple professors expressed concern that the misidentification of students for disciplinary action reflected profiling and selective enforcement on the part of MIT.

160. MIT applies disparate treatments to protests by pro-Palestine groups vs. counter-protests by pro-Israel groups—including outside groups sponsored by Israel's Consulate in Boston on the front steps of MIT's iconic entrance on 77 Massachusetts Ave on Friday, May 3rd, 2024. MIT President Sally Kornbluth described the Israeli counter-protest as being "in support of *our* Israeli and Jewish students" (emphasis added), thus erasing the anti-Zionist Jewish students at MIT who support justice for both Palestinians and Jews.[99]

161. MIT's programming contributes to an environment that is hostile to Palestinian, Arab, and Muslim students and faculty and anyone expressing support for Palestinian human rights. MIT has hosted speakers advocating support for Israeli aggression, including the bombing of civilian populations, hospitals and universities, and who defend the genocide

---

[98] https://spcommreports.ohchr.org/TMResultsBase/DownLoadPublicCommunicationFile?gId=29849
[99] https://mondediplo.com/outside-in/mit-gaza

being committed in Gaza. For example, during a recent "history" talk, Prof. Ute Deichmann of Ben Gurion university denied that Israel is perpetrating genocide and accused anti-genocide students' protests of being organized by Hamas and financed by Qatar. She also compared the protests' organizers to Nazi students organizing antisemitic pogroms in Germany in the 1930s.[100] MIT has also allowed its faculty to participate in weapons- and surveillance-projects sponsored by Israel's Ministry of Defense, thereby breaching its own "red lights" and "elevated risk" guidelines banning collaboration with entities violating human rights.[101] Programming of this kind creates a hostile environment for Palestinian, Arab, and Muslim members of the University community.

### *Plaintiff Sues the Defendants Jointly and Severally*

162. Plaintiff asserts joint and several causes of action against all Defendants.

163. The First Amendment claim is directed at all Defendants, because the Committee is a government entity, and MIT for the purposes of that cause of action has become a state actor—due to the Committee's coercive action against MIT. Under the government's threats, MIT has renounced its integrity as a separate non-compliant institution to the point of functioning as a state actor itself.

164. In other words, there has been a meeting of purposes between MIT and the Committee to engage in conduct to deprive Plaintiff of constitutional rights.

---

[100] https://calendar.mit.edu/event/he-limitations-of-historical-comparisons-with-the-nazi-era-student-protests-against-israel-antisemitic-nazi-student-campaigns-and-abuses-of-chatgpt
[101] https://facultygovernance.mit.edu/sites/default/files/reports/2020-12_Final_Report_of_the_Ad_Hoc_Committee_to_Review_MIT_Gift_Processes.pdf; https://globalsupport.mit.edu/planning-agreements/elevated-risk-project-review-process/

165. Each of MIT and the Committee has aided and worked in concert with the other to violate the Plaintiff's rights; for this reason, MIT is named as a co-defendant on the First Amendment claim.

166. Plaintiff asserts that the Committee is acting with no valid legislative purpose and therefore cannot assert the protection of the Speech and Debate clause, and is therefore subject to jurisdiction and suit in this Court.

167. In the alternative, if the Committee is entitled to immunity, Plaintiff asserts this cause of action against MIT alone, as the *AT&T* line of cases, *RNC v. Pelosi* and *Khalil v. Columbia* indicate is possible.

168. Also, the Plaintiff's claims for discrimination and breach of contract lie against MIT independently of the Committee's presence in or absence from the case.

169. The Committee is not a necessary party to any of these claims. The Court may also note that the Committee has a right to intervene in actions it considers to affect it and historically has done so on a number of occasions, including when subpoenas to third parties were being challenged.

170. For the reasons given, Plaintiff has asserted claims which lie both jointly and separately against the Committee and MIT.

## CLAIMS FOR RELIEF

**COUNT I: VIOLATION OF THE FIRST AMENDMENT**

**The Committee's demand that MIT relinquish Plaintiff's records violates the First Amendment**

**(Against All Defendants)**

171. Plaintiff restates the foregoing paragraphs as if set forth fully herein.

172. Plaintiff seeks declaratory and prospective injunctive relief against the Committee and Chairman Walberg in their official capacities to halt the Committee's ongoing and threatened future violations of Plaintiff's First Amendment rights, including the Committee's continuing demands for records that would identify and expose Plaintiff and chill his protected speech and associations.

173. Coercion of a third party can be the means by which the government violates the First Amendment rights of another. The First Amendment prohibits government officials from wielding their power selectively to punish or suppress speech, directly or (as alleged here) through private intermediaries.

174. The First Amendment guarantees the right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious and cultural ends. Indeed, privacy in group association is indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs.

175. The government may regulate in the First Amendment area only with narrow specificity, and compelled disclosure regimes are no exception. Thus, when it comes to a person's beliefs and associations, broad and sweeping state inquiries into these protected areas discourage citizens from exercising rights protected by the Constitution.

176. When it comes to the freedom of association, the protections of the First Amendment are triggered not only by actual restrictions on an individual's ability to join with others to further shared goals. The risk of a chilling effect on association is enough, because First Amendment freedoms need breathing space to survive.

177. The First Amendment proscribes the Government not only from directly infringing upon those rights but also from infringing upon them indirectly through the use of techniques

like jawboning, a strategy which allows government officials to expand their regulatory jurisdiction to suppress the speech of targets that they have no direct control over.

178.  As outlined above, by sending the two letters and by publishing its reports, the Committee has repeatedly pressured MIT to suppress and punish student, faculty and staff's protected speech that the Committee disfavors—particularly speech regarding Palestinian human rights.

179.  Through its inquisition of three university presidents at a public hearing in December 2023 and its subsequent October 31, 2024, and March 17, 2026, Reports, the Committee has also pressured universities to suppress speech supporting Palestinian human rights. The absurd lines of questioning at the hearing, in combination with the threats made against university presidents and trustees, produced severe consequences. The latter include two university presidents' resignations, the firing and/or suspension of numerous faculty members, and the doxing and harassment of administrators, faculty, staff and students by members of Congress, their staffs and third-party individuals and entities. These outcomes show that the Committee's tactics carry real, life-altering consequences and chill protected speech among members of the MIT community, including this Plaintiff whose course proposal is still being rejected by MIT Linguistics.

180.  Following the Committee's public attacks on former Harvard University President Claudine Gay, Dr. Gay, like many other students and faculty members, "faced death threats and was called the N-word during a weeks-long attack on her character designed to end her presidency." Also akin to the experiences of Plaintiff, an ABC News article discusses a broad campaign to dox and harass Dr. Gay in order to force either her resignation or her dismissal.

181.  In light of the foregoing, even the veiled threats of exposure, jawboning, funding cuts or stoppages, were sufficient to intimidate MIT into complying with the Committee's demands in order to assure their own survival as an academic institution.

182.  The Committee's letters request what would amount to thousands of pages of disciplinary records, which infringe upon the Plaintiff's and other faculty, staff and students' privacy of association that is indispensable to their freedom of association, without any clarity as to how these records aid any legitimate legislative purpose.

183.  The Committee's letters explicitly demonstrate its viewpoint discrimination toward any speech or expression that opposes Israel's actions against Palestinian people and/or that lifts up the human rights of the Palestinian people. The letters reveal the Committee's intent to target this political speech and association.

184.  The Committee is using, and is pushing MIT to use, a definition of antisemitism that treats criticism of the State of Israel as bigotry and discrimination even as it does not impose such negative labels and consequences on criticisms of the Palestinian people, the U.S. or other foreign governments. Plaintiff's criticisms of Israel—that it is a racist state, led by war criminals, and/or in some ways similar to Nazi Germany—are consistent with the growing acknowledgment by human rights groups and scholars that Israel is committing genocide.[102] Plaintiff challenges the Committee's definition of antisemitism facially and as-applied.

---

[102] *See, e.g.*, B'tselem, Our Genocide (July 2025), https://www.btselem.org/sites/default/files/publications/202507_our_genocide_eng.pdf;  Molly  Quell,  Leading genocide scholars organization says Israel is committing genocide in Gaza, PBS News, Sept. 1, 2025, https://www.pbs.org/newshour/world/leading-genocide-scholars-organization-says-israel-is-committing-genocide-in-gaza

185. When viewing the totality of these circumstances, it can be reasonably understood that the Committee's letters and reports, and its continued focus on MIT, and by proxy the Plaintiff, are intended to convey a threat of adverse government action. The harm is not merely retrospective. The Committee has already issued two letters over the course of this "investigation," has publicly stated its intention to continue oversight, and has not withdrawn or narrowed its demands. As a result, Plaintiff reasonably fears that—absent an injunction—the Committee will continue to send demands and public accusations aimed at compelling disclosure and facilitating doxing-style retaliation, thereby continuing to chill Plaintiff's speech and association going forward.

186. The Committee is not immune from this Complaint under the Speech and Debate Clause. The Committee's overly broad letters, compelling MIT to produce hundreds of pages of private student disciplinary records, do not substantially relate to any valid legislative purpose, let alone any compelling government interest.

187. The Committee's letters, along with its other actions, as detailed above, demonstrate the Committee's lack of concern with actual incidents of antisemitism and its intent to deter, malign and punish individuals for their viewpoints. There can be no legitimate legislative purpose when the Committee is violating the First Amendment by improperly suppressing through a third actor's protected speech because of the viewpoints expressed.

188. The Committee's letters serve no legitimate legislative purpose and violate the First Amendment because they are predicated on clear viewpoint discrimination, endeavor to deploy unlawful jawbone tactics to suppress through a third party's protected speech based on that viewpoint, and can be reasonably seen as a clear intent to chill associational and speech rights.

189. The Committee's project also violates the Establishment Clause, in that it singles out not just for endorsement, but for enforcement, a single faith's claims and assertions about Palestine, and punishes those of other faiths who disagree or critique these views, or advance those of other faiths.

190. MIT, by virtue of having complied with the Committee's demands and having furnished FERPA-protected documents to the Committee, should also be deemed a "state actor" for the purposes of the First Amendment analysis, *cf. Republican Natl. Comm. v. Pelosi,* 602 F. Supp. 3d 1, 22-23 (DDC 2022), *vacated on other grounds* 2022 U.S. App. LEXIS 26068 (DC Cir Sep. 16, 2022, No. 22-5123)*; Khalil v. Trustees of Columbia Univ. in the City of NY, 20*26 U.S. Dist LEXIS 58267, at *44 (S.D.N.Y. Mar. 19, 2026, No. 25-cv-2079 (AS)) ("[T]o the extent the evidence shows that the private party intended to deprive the plaintiff of their constitutional rights or acted jointly with the government in doing so, there would be liability").

**COUNT II: Massachusetts Civil Rights Act (M.G.L.c. 12, §11H)**

**(Against MIT)**

191. Plaintiff restates the foregoing paragraphs as if set forth fully herein.

192. Plaintiff has exercised, enjoyed, and attempted to exercise and enjoy rights protected under state and federal laws and constitutional provisions, including but not limited to:

    a) The right to freedom of speech under the First Amendment to the United States Constitution;

    b) The right to freedom of speech under Article 16 of the Massachusetts Declaration of Rights.

193. Defendant MIT interfered with Plaintiff's exercise, enjoyment, and/or attempted exercise or enjoyment of these rights by, among other things:

   a) Rejecting Plaintiff's proposed Special Topics linguistics seminar;

   b) Removing Plaintiff from the MIT Linguistics academic unit;

   c) Withholding Plaintiff's pay raise;

   d) Freezing Plaintiff's salary;

   e) Embargoing videos of Plaintiff's People's Seminar.

194. Defendant's interference included discrimination, threats, intimidation, retaliation, and coercion, including but not limited to economic coercion, threats of economic coercion, modification of Plaintiff's contract, and damage to reputation.

## COUNT III: Massachusetts General Law Chapter 151B

## (Against MIT)

195. Plaintiff restates the foregoing paragraphs as if set forth fully herein.

196. Plaintiff has satisfied the administrative prerequisite for bringing claims under M.G.L.c. 151B by filing a complaint with the Massachusetts Commission Against Discrimination (MCAD) in May 2025 and, pursuant to M.G.L.c. 151B, §9, now brings this civil action.

197. By targeting Plaintiff to suppress his protected speech and creating a hostile environment, MIT failed to provide an environment free of discrimination or harassment based on Plaintiff's and other co-workers' and students' racial identity, national origin and association with Palestinian and pro-Palestinian students and co-workers. That much has been recognized in a letter to MIT President Sally Kornbluth from the U.N. Special

Rapporteurs on the Right to Education.[103] The U.N. Rapporteurs have expressed their concerns about serious allegations of human rights violations on campus, primarily concerning the suppression of pro-Palestinian expression since October 2023. The concerns center on reported instances of excessive disciplinary measures, arrests, use of force, and the disproportionate targeting of students of color, which the U.N. experts believe may violate rights including freedom of expression, of assembly, of association and of education.

198. As stated in the U.N. letter to MIT, the environment at MIT, which has been rendered hostile for the Plaintiff and the pro-Palestinian students and co-workers he associates with, is sufficiently severe, pervasive, persistent and offensive such that it deprives them of equal access to the opportunities and benefits that MIT provides to other students and co-workers.

199. By restricting and denying access to campus facilities for events and protests, by failing to stop student-on-student bullying and assault, by removing Plaintiff from his academic unit of 28 years, and by subjecting him to other sham disciplinary measures without due process, MIT has affected Plaintiff's career and well-being by reason of his race and association with Palestinian and pro-Palestinian students and co-workers.

200. MIT has retaliated against Plaintiff for opposing its unlawfully discriminatory practice.[104]

201. Plaintiff's support of the Palestinian people has also subjected him to anti-Palestinian discrimination by MIT, bringing him within the protections of M.G.L.c. 151B for associative discrimination.

---

[103] https://spcommreports.ohchr.org/TMResultsBase/DownLoadPublicCommunicationFile?gId=29849
[104] https://mondoweiss.net/2025/04/i-faced-censorship-and-attacks-at-mit-for-trying-to-teach-about-palestine-this-reflects-the-rising-fascism-in-higher-education/

202.  This conduct violates M.G.L.c. 151B.

203.  As a direct and proximate result of MIT's actions and inactions in violation of M.G.L.c. 151B, Plaintiff has sustained substantial injury, damage and loss, including, but not limited to: emotional distress, physical harm, psychological damages, loss of future career opportunities, reputational damages, economic injuries and other direct and consequential damages.

204.  Accordingly, Plaintiff is entitled to all relief available under M.G.L.c 151B, including damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief.

## COUNT IV: BREACH OF CONTRACT

## (Against MIT)

205.  Under Massachusetts law, the relationship between a private university and its faculty is contractual. MIT's written policies and official governance documents—including MIT's Rules and Regulations of the Faculty,[105] MIT's Policies and Procedures,[106] and MIT's Statement on Freedom of Expression and Academic Freedom[107]—form part of that contract and create enforceable obligations. Recent Massachusetts cases confirm that faculty handbooks, published procedures and statements such as institutional academic-freedom policies, may be incorporated into the employment relationship and must be substantially honored.

206.  These MIT policies promise, among other things, academic freedom and freedom of expression, fair procedures, and protection against retaliation for protected speech and

---

[105] https://facultygovernance.mit.edu/faculty-rules-page
[106] https://policies.mit.edu/policies-procedures
[107] https://facultygovernance.mit.edu/sites/default/files/reports/20221221_MIT_Statement_on_Freedom_of_Expression_and_Academic_Freedom.pdf

association on matters of public concern. MIT's policies also commit the Institute to appropriate confidentiality and handling of personnel and disciplinary records, including limits on disclosure of sensitive information.

207. Plaintiff reasonably relied on these commitments in accepting and continuing his faculty appointment, and they are material terms of the contractual relationship between Plaintiff and MIT. MIT breached these contractual obligations through the specific acts and omissions alleged in FACTS above, including, inter alia:

    a) unprecedented *ad hoc* review procedures and course censorship;

    b) economic sanctions and pay consequences imposed without fair process or clear rule identification;

    c) censorship of academic announcements;

    d) misuse of "disruption" and "misconduct" labels to punish protected written speech opposing discrimination;

    e) removal/exclusion from academic unit of 28 years and salary freeze;

    f) an HR investigation pursued in a manner inconsistent with promised fairness; and

    g) MIT Open Learning's embargo of People's Seminar recordings in "Palestine Exception" mode.

208. As a direct and proximate result of MIT's breaches, Plaintiff has sustained substantial injury, damage and loss, including but not limited to emotional distress, physical harm, psychological damages, loss of future career opportunities, reputational damages, economic injuries and other direct and consequential damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

A. **Declaring** that Defendants' actions violate Plaintiff's rights under the First Amendment to the United States Constitution, the Massachusetts General Laws chapter 151B, and his contract with MIT.

B. **Granting Preliminary and Permanent Injunctive Relief** enjoining Defendants, their officers, agents, and employees from:

a) Demanding, requesting or otherwise seeking (including through informal or "voluntary" requests) the disclosure by MIT of confidential, personally identifying information referring or relating to Plaintiff, his scholarship, his communications or his protected associations and viewpoints, absent lawful process and court supervision;

b) Publishing, distributing or otherwise disseminating any confidential information referring or relating to Plaintiff that has been obtained from MIT;

c) Voluntarily disclosing, producing or transmitting confidential information referring or relating to Plaintiff to the Committee absent a subpoena or other lawful compulsory process, and absent reasonable notice and an opportunity for Plaintiff to seek protective relief;

d) Engaging in any further acts of discrimination, retaliation, viewpoint-based censorship, facilitation of doxing, accusation of antisemitism or any other sort of harassment against Plaintiff for his exercising his rights to academic freedom, protected speech and association with students and co-workers in protected classes.

C.  **Awarding** compensatory damages (against MIT) in an amount to be determined at trial;

D.  **Awarding** Plaintiff reasonable attorneys' fees and costs of this action pursuant to 42

U.S.C. §1988 and any other applicable authority;

E.  Granting such other and further relief as the Court deems just and proper.

**Dated:** March 28, 2026

**Counsel for Plaintiff:**

Jolie Parisi
15 Church St
Salem, MA 01970
617-833-2000
jolie@jparisilaw.com

Signature

Jonathan Wallace
PO #728
Amagansett NY 11930
917-359-6234
jonathan.wallace80@gmail.com
Pro Hac Vice application pending

66/66